[Civ. No. 36614. First Dist., Div. Three. Dec. 23, 1975.]

WILLIAMS PLUMBING COMPANY, Plaintiff and Appellant, v. GROVER C. SINSLEY et al., Defendants and Respondents.

**COUNSEL**

William G. Filice and J. A. London for Plaintiff and Appellant.

Robert P. McNamee for Defendants and Respondents.

OPINION

**GOOD, J.**\*—On September 16, 1973, a deposit receipt was executed between appellant Williams Plumbing Company, as buyer, and respondent Grover C. Sinsley, as seller. Respondent Mrs. Sinsley did not sign but no issue was raised either at trial or on appeal, presumably because she was present when the terms of sale were negotiated and the blanks in the form were filled in in her handwriting. The property consisted of two Sunnyvale duplexes. The purchase price was $120,000 with $12,000 paid on September 16, an additional $15,000 to be paid on January 4, 1974, and the balance due and payable on or before March 1, 1974. Both parties were contractors in the San Jose area and had known each other for some time. Some months prior to the deposit, respondent Sinsley suggested the purchase to Richard Crosslin, principal owner and manager of appellant corporation. Sinsley originally wanted the transaction completed early in January 1974, but Crosslin wanted more time hoping that lower interest rates might obtain when he made his loan to finance the purchase. The difference was resolved by the provision for the January 4 installment of $15,000. The deposit receipt contained the following provision: ". . . in the event said purchaser shall fail to pay the balance of said purchase price or complete said purchase as herein provided, time being of the essence of this contract, the amount of said deposit shall at the option of the seller, be forfeited as liquidated damages."

Shortly after November 27 or early in December, Sinsley telephoned Crosslin and said he had been talking to Citizens Savings and Loan and had been told they were making pretty good loans. He suggested that Crosslin talk to Mr. Lyons at Citizens about financing the purchase. Crosslin testified that Sinsley said he'd like the deal closed as soon after January 1 as possible and said he didn't think interest rates were going to decrease. Crosslin also testified that Sinsley called again in the latter part of December and told Crosslin he would like him to run the loan through the same company that carried Sinsley's loans to avoid prepayment penalties. Sinsley denied making the second call but testified that Crosslin telephoned him about a week before January 4 and said he wasn't going to wait until March but "would close out the whole thing right away." But Sinsley did not otherwise contradict the substance of the two calls as testified to by Crosslin.

---

\*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

Crosslin did not make the January 4 payment, although he had some $22,000 in his commercial account at the time. After Sinsley's call in November or early December, he had gone to Citizens to start negotiations for loans of some $48,000 on each duplex and had ordered a preliminary title report that was issued December 24. A vice president of Citizens testified that (as of February 8, 1974, at the latest) everything was in order except a few documents which had not been received and that upon their receipt the loans would have been approved.

On January 5, Sinsley went to Crosslin's office. The testimony as to the exchange that there occurred is indefinite and leaves details unarticulated. Crosslin testified that he went to get his checkbook to show Sinsley that he had the money but he did not testify that he showed Sinsley the balance or tendered the $15,000. He said he was shocked and became mistrustful when Sinsley announced that the failure to pay the installment put him "in the driver's seat" and that the $12,000 could be forfeited. The Sinsley testimony admits the reference to a "driver's seat" and proceeds that Crosslin became upset and said he did not think the installment was important; that Sinsley could not recall whether or not Crosslin expressed any reason for thinking the January 4 payment unimportant (neither party made any reference to the December phone calls re closing the whole transaction right after the first of the year); that Crosslin "began to say some things I didn't expect him to say" whereupon I said "It's best we break this up and get out of here." Crosslin testified that just before leaving, Sinsley said he would let Crosslin know his final decision on the 7th. Accordingly, the deal and appellant's $12,000 were left dangling.

Crosslin immediately went to his attorney and that afternoon mailed a $15,000 check to Valley Title Company (named in deposit receipt) to be held in escrow on the two duplexes. A letter notifying Sinsley of the deposit was also mailed but before delivery of that letter and on January 7, Sinsley mailed a letter to Crosslin declaring the contract terminated and refunding the $12,000 deposit. On the advice of his attorney, Crosslin cashed the $12,000 check and banked the proceeds.

On February 4, appellant filed an action for specific performance asking that upon payment of the full purchase price and performance of all of the conditions of the contract the respondents be ordered to convey said duplexes. The trial court found, among other things, that appellant was at all times willing and able to consummate the purchase; that the purchase price was fair and reasonable; that appellant had failed to pay

the January 4 installment of $15,000 when due; that the failure was not unlawful, grossly negligent or intentional; and, that respondents did not sustain any loss or injury on account of appellant's delay in paying said installment. These findings were made over respondents' objections.[1] However, the trial court found that appellant's failure to pay was a material breach of the contract and, time being of the essence, concluded that appellant was not entitled to specific performance. This appeal is from the judgment that was accordingly entered. We have considered the issues and contentions of the parties and find only two of them are of sufficient merit to require discussion. They are:

## I.  *Was time of the essence? Yes.*

■  The trial court in its memorandum decision and findings found that the clause in question made time of the essence of the payments required by the contract. The fact that the phrase "time being of the essence of this contract," is inserted by way of recital does not affect its operation. The recital is not ambiguous. Accordingly, its interpretation does not require or depend upon extrinsic evidence. The finding of the trial court was correct.

■  The fact that the validity of the clause in question as a contract for liquidated damages may be questioned (cf. Civ. Code, § 1671; *Rice* v. *Schmid* (1941) 18 Cal.2d 382 [115 P.2d 498, 138 A.L.R. 589]; *Greenbach Bros., Inc.* v. *Burns* (1966) 245 Cal.App.2d 767 [54 Cal.Rptr. 143]) does not mean that the recital, as an agreed premise, is not effective as to the other commitments of the contract. The same consideration applies to arguments predicated upon the invalidity of the forfeiture aspects of the clause.  ■  Although public policy considerations may be applicable to these two aspects of the paragraph in question, there is nothing against public policy in making time the essence of a contract. The forfeiture and liquidated damage aspects are readily severable from the rest of the contract and any invalidity of these aspects does not vitiate the clause as to the remainder of the contract. (See 1 Witkin, Summary of Cal. Law (8th ed. 1973) Contracts, § 342 et seq., p. 289 et seq.)

[1]After the court entered its memorandum decision, appellant requested findings and conclusions and respondents' counsel was ordered to prepare them along with a proposed judgment. The clerk's transcript contains only findings prepared by appellant's counsel although the judgment appears to have been drafted by respondents' counsel.

## II. *Did the delay give the sellers the right to terminate the contract? No.*

In its memorandum decision the court cited *Major-Blakeney Corp.* v. *Jenkins* (1953) 121 Cal.App.2d 325 [263 P.2d 655], for the proposition "that a failure of a party to comply with the terms of his contract, time being of the essence, entitles the other party to terminate the contract." The case has not been overruled nor has its rule been qualified. But curiously, shepardization discloses no citation by California courts for that particular rule or aspect of the case. The significance of the case lies in the development of rules concerning the amount of restitution a defaulting buyer is entitled to as against a seller's damages resulting from default. Be that as it may, we are of the opinion that its announced unqualified rule[2] is at odds with prior and subsequent developments in California law that culminate in *MacFadden* v. *Walker* (1971) 5 Cal.3d 809 [97 Cal.Rptr. 537, 488 P.2d 1353, 55 A.L.R.3d 1].

The *MacFadden* Court does not discuss *Major-Blakeney, supra,* but begins its review with *Barkis* v. *Scott* (1949) 34 Cal.2d 116 [208 P.2d 367], wherein the Supreme Court rules that even though time was of the essence relief was available for buyers who could bring themselves under Civil Code section 3275 which provides: "Whenever, by the terms of an obligation, a party thereto incurs a forfeiture, or a loss in the nature of a forfeiture, by reason of his failure to comply with its provisions, he may be relieved therefrom, upon making full compensation to the other party, except in case of a grossly negligent, willful, or fraudulent breach of duty."

There is language in *Barkis* indicating that relief may be granted only if there has been substantial part performance or if the vendee has made substantial improvements to the property in reliance on the contract; and, if the only forfeiture involved is a loss of benefit of the bargain, relief from default is not available if time was of the essence of the contract. (*Id.,* at pp. 122-123.) No explanation is given for this limitation of the right to relief from a forfeiture under section 3275.

In *Freedman* v. *The Rector* (1951) 37 Cal.2d 16 [230 P.2d 629, 31 A.L.R.2d 1], the court held that section 3275 was not the exclusive

---

[2]We note that immediately after its holding, the *Blakeney* court observes: "The record clearly establishes that there was no waiver of any of the terms of the contract and at no time did defendants [vendors], or their agent, give plaintiff [vendee] valid reason to believe its rights under the escrow would be restored." It then quotes from Mr. Blakeney's testimony to support its observation. (121 Cal.App.2d at pp. 331-332.)

method of granting relief from forfeiture in these situations. Therefore, even though plaintiff's breach was wilful and he did not qualify for relief under section 3275, the court ordered return of any money paid by the vendee which was not necessary to compensate the vendor for actual damages caused by the breach. The court ruled that the forfeiture was the equivalent of punitive or liquidated damages and that neither punitive nor liquidated damages were justified. (Civ. Code, §§ 3294, 1670, 1671.) At page 19, the court makes it clear that specific performance was denied only because the vendor had sold the property in controversy to a third person. The case, therefore, dealt only with the amount of restitution that the defaulting vendee was entitled to.

In *MacFadden v. Walker, supra*, 5 Cal.3d 809, the contract provided that time was of the essence and the vendee after paying $2,500 of the approximately $3,500 due on the property, wilfully failed to make further installment payments. The vendee later deposited the entire unpaid balance with the court. The court rule that the anti-forfeiture policy recognized in *Freedman, supra,* justified awarding even defaulting vendees specific performance in proper cases and said restitution of the excess of the part payments over the damages caused by the breach was not the exclusive remedy. (*Id.,* pp. 814-815.) The opinion appears to recognize that loss of the benefit of the buyer's bargain is the equivalent of a penalty or forfeiture within the meaning of the code sections relied on in *Freedman, supra.*

Further, *MacFadden* rejected a vendor's contention that *Honey v. Henry's Franchise Leasing Corp.* (1966) 64 Cal.2d 801 [52 Cal.Rptr. 18, 415 P.2d 833], established that restitution of the excess of part payments over damages caused by breach of contract for the sale of land is the exclusive remedy available to a wilfully defaulting vendee. The court said: "[W]e note again, as we also did in the *Honey* case, Professor Hetland's [Hetland, Cal. Real Estate Secured Transactions (1970) §§ 3.58-3.61, pp. 100-134] persuasive arguments that installment land sale contracts should be treated as security devices substantially on a par with mortgages and deeds of trust, and that therefore 'the law governing those security devices should be adopted with appropriate modifications in determining the remedies for breaches of installment contracts.' [Citations.] That law affords even the wilfully defaulting debtor an opportunity to cure his default before losing his interest in the security. [Citations.]" (At p. 816.) The wilfully defaulting vendee was granted specific performance.

*MacFadden* was reported at 55 A.L.R.3d 1, with an exhaustive annotation which indicates that even where time is of the essence, a default in payment of an installment does not create an absolute right of vendor to terminate. The author notes on page 16, an "indication of movement in the courts in the direction of treating an installment land contract as substantially the equivalent of a mortgage or a deed of trust." Numerous cases in various jurisdictions are discussed wherein specific performance was ordered in favor of defaulting vendees. The equities differ from case to case: Acceptance of late payments; failure to give notice of termination when required by the contract; and other acts on the part of a vendor, etc. But in the case before us it is clear that vendor's admitted suggestion that vendee proceed to get his loan and close the transaction as soon as possible after January 1 and the second conversation a week before the due date of the defaulted payment played some part in the vendee's failure to pay the installment of January 4. ■ The testimony as to these conversations supports the finding that appellant's failure to pay was "not unlawful, grossly negligent or intentional." We find no other testimonial support or explanation in the record.

In *MacFadden* the breach was wilful, a word that connotes intentional. Here the court found that the breach was not intentional. *MacFadden's* facts do not reflect the ameliorating circumstance found in the case at bench of respondents' at least tacit approval in December of closing the whole transaction shortly after January 1. It would be illogical to afford appellant less relief than that given to the defaulting vendee in *MacFadden.* In the circumstances here present, the mere fact that respondents voluntarily refunded the deposit or made restitution that would have been eventually required by law should not cause a forfeiture of appellant's rights under the contract. Under the findings adopted by the court the conclusion that appellant was not entitled to specific performance is erroneous.

The judgment is reversed and the case remanded with instructions to order respondents to deposit a grant deed in escrow at Valley Title Company with instructions to deliver the same to appellant upon payment to respondents of the full purchase price within such reasonable time as may be required for appellant to complete its financing not exceeding 56 days after entry of said judgment, being the number of days elapsing between January 4 and March 1 of 1974. It is further ordered

that each party shall bear his own costs on appeal except that the costs of the record on appeal shall be shared equally between appellant and respondents.

Brown (H. C.), Acting P. J., and Scott, J., concurred.

A petition for a rehearing was denied January 22, 1976, and respondents' petition for a hearing by the Supreme Court was denied February 18, 1976.