IRVING A. JENKINS and MAY C. JENKINS, Plaintiffs-Appellees, *v.* LOUISE H. WISE, Defendant-Appellant, and EUGENE W. WELLS and MARGARET WELLS, Interveners

and

IRVING A. JENKINS and MAY S. JENKINS, Plaintiffs-Appellees, *v.* LOUISE HOOVER WISE and WERNER GEORG EHRENSBERGER, Defendants-Appellants and EUGENE W. WELLS and MARGARET WELLS, Interveners

NO. 5885

FEBRUARY 8, 1978

RICHARDSON, C.J., KOBAYASHI, OGATA, MENOR AND KIDWELL, JJ.

OPINION OF THE COURT BY MENOR, J.

This is an appeal from a judgment of the circuit court decreeing the cancellation of certain agreements of sale at the instance of the vendors and denying the counterclaim of the purchasers for specific performance. The purchasers appeal.

Plaintiffs below, Irving A. Jenkins and his wife, May Jenkins (hereinafter "Jenkins" or "Sellers"), were the owners of two adjacent parcels of land at Aliomanu, Anahola,

Kauai: Tax Map Key No. 4-9-04-18 (hereinafter Parcel 18), and Tax Map Key No. 4-9-04-19 (hereinafter Parcel 19). Jenkins listed the two parcels for sale with defendant Werner G. Ehrensberger, a real estate broker. In early 1971, defendant Louise Wise made an offer to buy one of the parcels. Thereafter, on March 10, 1971, Jenkins and Wise entered into a Deposit, Receipt, Offer and Acceptance agreement (hereinafter DROA) for the installment sale and purchase of Parcel 18. The agreement of sale for this parcel was executed on April 29, 1971. It provided for a purchase price of $50,000.00, payable as follows: $6,000.00 down, and the balance in semi-annual installments of $4,000.00 each, payable on April 15 and October 15 of each year until all sums, including interest on the unpaid balance at 12% per annum, were paid in full. The agreement of sale also gave Wise an option to purchase Parcel 19 upon identical terms. On September 15, 1971, a second agreement of sale covering Parcel 19 was entered into pursuant to the option agreement. The semi-annual payments on Parcel 19 were payable on March 15 and September 15 of each year, beginning March 15, 1972. The agreement of sale for Parcel 19 listed Ehrensberger and Wise as purchasers taking as joint tenants. The initial down payment of $6,000.00 was made for Parcel 18 on April 29, 1971, and $6,000.00 for Parcel 19 on September 15, 1971. Ehrensberger received a commission of $3,000.00 for the sale of Parcel 18 and a similar commission for the sale of Parcel 19.

The first installment of $4,000.00 for Parcel 18 became due on October 15, 1971 and was paid. The first semi-annual installment payment of $4,000.00 for Parcel 19 fell due on March 15, 1972, and the second installment of $4,000.00 became payable on April 15, 1972. These sums not having been paid when due, Jenkins, on September 12, 1972, hand-delivered notices of cancellation to both Ehrensberger and Wise, and on September 28, 1972 registered the notices of cancellation with the Bureau of Conveyances. Both agreements of sale provided for this mode of cancellation, following default by the purchasers for thirty days or more.

On October 2, 1972, however, Jenkins wrote to Mrs.

Wise: "Having received no reply to my last letter [the notice of cancellation] regarding the Aliomanu property if I do not hear from you by October 6th 1972 this will be placed in the hands of my attorney."[1] In the meantime, Wise and Ehrensberger had been negotiating with Eugene W. Wells and Margaret Wells, husband and wife, for the sale of the properties, and on October 11, 1972, the parties executed a DROA wherein the Wells agreed to pay $151,000.00 for both parcels of property. On the strength of this agreement, Ehrensberger wrote to Jenkins informing them that the parcels had been sold and that he and Wise would tender the balance of the purchase price to Jenkins on November 15, 1972. No tender, however, was made on that date.

On December 29, 1972, Jenkins brought suit for a judicial determination that the defendants were in default under the terms of the agreements of sale and prayed that the agreements be cancelled. Defendants Ehrensberger and Wise, on the other hand, counterclaimed for specific performance, alleging, *inter alia,* that Jenkins "wrongfully and maliciously interfered with attempts by the defendant[s] to sell the subject property to [the Wells] thereby preventing payments by the defendant[s] of the entire balance of the Agreement[s] of Sale." The Wells intervened and requested that specific performance of their contract with Ehrensberger and Wise be ordered, or, in the alternative, that damages incurred as a result of the latter's default under that contract be awarded to the interveners.

After trial, the trial court, ordered the agreements cancelled, denied the defendant purchasers' prayer for specific performance, and awarded the Wells nominal damages against Ehrensberger and Wise for breach of contract. The Wells have not appealed.[2]

---

[1] This was apparently intended by the vendors to afford the purchasers a further opportunity to cure their default. Vendors' counsel conceded as much in oral argument.

[2] See Castle v. Irwin, 25 Haw. 786 (1921).

I

An agreement of sale in this jurisdiction has become a common and established device utilized in the sale and purchase of real property. It is an executory contract which binds the vendor to sell and the vendee to buy the realty which constitutes the subject matter of the transaction. *State Savings & Loan v. Kauaian Development*, 50 Haw. 540, 445 P.2d 109 (1968). It is often the only means by which low income purchasers are able to buy land, for the agreement of sale transaction enables them, initially at least, to bypass the substantial down payment requirements based on loan-to-value ratios imposed upon lending institutions for conventional loans by state and federal regulations. The vendor, on the other hand, can establish his own ratios and thus is able to effect an enlargement of the land and housing market towards which his sales efforts are directed.

Under an agreement of sale, the legal title to the property remains in the seller, but upon the execution and delivery of the agreement of sale, there accrues to the vendee an equitable interest in the land. *Cf. Hofgaard & Co. v. Smith*, 30 Haw. 882 (1929). The purchaser becomes vested with the equitable and beneficial ownership of the property, *Kresse v. Ryerson*, 64 Ariz. 291, 169 P.2d 850 (1946), and unless the agreement provides otherwise, the vendee is entitled to its immediate possession. The legal title is retained by the vendor essentially as security for the payment by the vendee of the purchase price. *See S.R.A., Inc. v. Minnesota*, 327 U.S. 558 (1946). Additionally, and as a further assurance to the vendor that the purchaser will perform his end of the bargain, the agreement of sale generally provides for cancellation and forfeiture, at the vendor's option, upon default by the vendee in the payment of the purchase price.

Strict foreclosure pursuant to the provisions of an agreement of sale has the effect of divesting the purchaser of his equitable interest in the property, as well as any right he may have to recover any moneys he has paid on account of the

purchase price. Equity, however, abhors forfeitures and where no injustice would thereby result to the injured party, equity will generally favor compensation rather than forfeiture against the offending party. *Bohnenberg v. Zimmermann*, 13 Haw. 4 (1900); *Moran v. Holman*, 501 P.2d 769 (1972); *Cf. Gonsalves v. Gilbert*, 44 Haw. 543, 356 P.2d 379 (1960).

The real object sought to be attained by the retention of the legal title by the vendor under an agreement of sale, and the inclusion of forfeiture provisions in the agreement, is the performance by the vendee of his promise to pay the purchase price. The penalty of forfeiture is designed as a mere security, and if the vendor obtains his money or his damages, he will have received the full benefit of his bargain. *See Bohnenberg v. Zimmermann, supra. Cf. Garrett v. Macfarlane*, 6 Haw. 435 (1883). Accordingly, where the vendee's breach has not been due to gross negligence, or to deliberate or bad-faith conduct on his part, and the vendor can reasonably and adequately be compensated for his injury, courts in equity will generally grant relief against forfeiture and decree specific performance of the agreement. *Rothenberg v. Follman*, 19 Mich.App. 383, 172 N.W.2d 845 (1969); *Williams Plumbing Company v. Sinsley*, 53 Cal.App.3d 1027, 126 Cal.Rptr. 345 (1976); *McFadden v. Walker*, 97 Cal.Rptr. 537, 488 P.2d 1353 (1971); *Moran v. Holman, supra; Parkhurst v. Lebanon Pub. Co.*, 356 Mo. 934, 204 S.W.2d 241 (1947); *Cheney v. Libby*, 134 U.S. 68 (1890); *Witherstine v. Snyder*, 225 Ill.App. 189 (1922); *Mosso v. Lee*, 53 Nev. 176, 295 P. 776 (1931); *Radach v. Prior*, 48 Wash.2d 901, 297 P.2d 605 (1956). In any event, whether and to what extent relief should be granted rests within the sound discretion of the trial court, *McWilliams v. Urban American Land Development Co.*, 37 Mich.App. 587, 194 N.W.2d 920 (1972); *Moran v. Holman, supra; see Peterson v. Lazarus*, 7 Haw. 129 (1887); *Andrews v. Mendonca*, 5 Haw. 446 (1885); *Hawaiian Paradise Park Corp. v. Friendly Broadcasting Co.*, 414 F.2d 750 (9th Cir. 1969), and a key factor in its determination is whether forfeiture would be harsh and unreasonable under the

circumstances.[3] *Rothenberg v. Follman, supra*. And even where equity declines to grant relief from the forfeiture of the purchaser's equitable interest in the land, it may nevertheless order the return of that portion of the purchase price already paid which it finds would constitute a penalty, rather than reasonable liquidated damages, for the breach. *Howard v. Bar Bell Land & Cattle Co.*, 81 Idaho 189, 340 P.2d 103 (1959). In either event, the trial court has the plenary power to fashion a decree to conform to the equitable requirements of the situation. *Fleming v. Napili Kai, Ltd.*, 50 Haw. 66, 430 P.2d 316 (1967), *reh. denied* 50 Haw. 83, 431 P.2d 299 (1967).

II

The question of whether relief against forfeiture should have been granted in this case, and specific performance in favor of the purchasers decreed, were matters addressed to the sound discretion of the trial court, and its decision will not be set aside unless manifestly against the clear weight of the evidence. *See First Hawaiian Bank v. Smith*, 52 Haw. 591, 483 P.2d 185 (1971). We think, upon review, that the trial judge erred in ordering the cancellation of the agreements of sale and in denying the purchasers their prayer for specific performance.

Jenkins' security interests in the property were never in jeopardy. They could not be deprived of the legal title by

---

[3] The amount already paid in relation to the total purchase price; the amount and length of the default; the reasons for the delay; the nature and extent of the improvements, if any, made upon the premises by the vendee in possession; the expenditures incurred by the purchasers in good faith reliance upon the agreement of sale; the value of the land as security for the unpaid balance of the purchase price; and the conduct and equities of the parties are among the considerations in determining whether a forfeiture would be harsh and unreasonable under the circumstances. Regarding "time is of the essence" clauses in agreements of sale, we agree with the court in Rothenberg v. Follman, supra:

"[T]he fact that the parties have stipulated that time is of the essence is but one of the factors to be taken into consideration in determining whether equity will intervene to set aside a forfeiture. Where the forfeiture is disproportionately large and the other facts, circumstances and equities cry out for relief, a court of equity may, nevertheless, intervene." 19 Mich. App. at 392, 172 N.W.2d at 850.

unilateral action of the purchasers. No transfer of the property would have been valid without their written consent. The value of the property securing the unpaid balance of the purchase price was not shown to be inadequate. The Wells were willing to purchase the premises from Wise and Ehrensberger for $151,000.00. An earlier offer of $130,000.00 from an unidentified prospective purchaser had been turned down by the defendants. The sum of $16,000.00 had already been paid to Jenkins on account of the purchase price. Only two semi-annual installments of $4,000.00 each were past due at the time they gave notice of cancellation on September 12, 1972. Another $4,000.00 became due on September 15, but on October 2, 1972, the time within which the purchasers could cure their default was extended by Jenkins to October 6, 1972. As of this last date there was then due and owing the total sum of $12,000.00. Until paid, these principal amounts were drawing interest at the rate of 12% per annum.

By the time the defendants received the extension letter of October 2, 1972, they were already in the process of reaching agreement with the Wells on the purchase price, and on October 11, 1972, they executed a DROA for the sale and purchase of the property. The agreement provided for a total purchase price of $151,000.00, with an initial payment of $100,000.00 "upon certification of good title and delivery of warranty deed." The closing date was set for November 15, 1972. On the strength of this agreement, Ehrensberger, on October 13, 1972, wrote to Jenkins:

> Please be advised that the two parcels of land at Anahola, which I jointly own with Mrs. Wise, have been sold. If escrow proceeds as normal, you should be cashed out completely by November 15.

Considering the fact that the entire balance of the purchase price was being paid in full,[4] the date proposed for its payment was not unreasonable.

Security Title Corporation was appointed escrow on October 17, 1972. On October 20, 1972, it issued its preliminary

---

[4] The agreements of sale provided for prepayment without penalty.

title report, which revealed a break in Jenkins' chain of title to Parcel 18. This created a problem relative to the time schedule for the closing of the transaction, and to further complicate matters Jenkins had left for the mainland United States on October 7 and did not return to Hawaii until the latter part of December. Defendant Wise meanwhile was compelled to engage the services of an attorney in an attempt to resolve the title question.[5] The title company ultimately agreed to accept an indemnity agreement from Mrs. Wise for title insurance purposes, and Mrs. Wise executed the document on January 15, 1973. This removed a major obstacle to the consummation of the Wells transaction. All that remained was the satisfaction of the Jenkins agreements of sale and the delivery of deeds of conveyance by Jenkins to Wise and Ehrensberger. On December 20, 1972, and again on January 23, 1973, Security Title wrote to Jenkins for exact information regarding the amounts necessary to satisfy in full their agreements of sale with Wise and Ehrensberger. These were to be satisfied from the moneys to be paid by the Wells into escrow. These requests were sent by certified mail, and Jenkins signed for both on January 26, 1973. They did not, however, respond to either letter, and on February 12, 1973, Security Title was moved to write to the Wells:

> "Our office has notified Mr. Jenkins, via certified mail that his Agreement of Sales were being satisfied in full and requested balances owing by Ehrensberger-Wise. To date, we have had no response to our requests."

Jenkins never did respond to these communications.[6] The

---

[5] The Jenkins agreement of sale provided that upon full payment of the purchase price Jenkins would deliver to the purchasers a warranty deed to the premises.

[6] The following from the transcript is indicative of the Jenkins' attitude regarding the Wells transaction:

Q. You testified that the defendants couldn't transfer the property to Wells because your consent was required under the agreement of sale?

A. [Mr. Jenkins] I did.

Q. Is it not also true that the agreement of sale provides that "Seller agrees that he will not withhold his consent to a bona fide assignment of this agreement arbitrarily, unreasonably, maliciously or capriciously, or otherwise than for a reasonable cause"?

A. Yes, and I believe I had reasonable cause.

Wells, nevertheless, on April 24, 1973, deposited the sum of $100,000.00 with escrow, and on the date of trial, June 8, 1973, withdrew that amount and deposited it with the trial court.

There was a valid contract between the Wells, as purchasers, and Wise and Ehrensberger, as sellers, and the trial court so found. The record shows that from and after November 15, 1972, the Wells were always ready, willing and able to perform. Their initial payment of $100,000.00 would have been more than sufficient to satisfy in full the Jenkins agreements of sale and to compensate Jenkins for whatever pecuniary injury they may have sustained as a result of the failure of the purchasers to pay the several installments when due. For that matter, the Wells were willing, at time of trial, to deposit with the court the remaining balance of $51,000.00 to secure the full payment of their purchase price. The delay in the consummation of the Wells transaction was principally due to the defect in Jenkins' chain of title, and the fact that it was never completed was the direct result of their unwillingness to cooperate in its consummation.

There was no wilful refusal on the part of Wise and Ehrensberger to perform or bad-faith conduct on their part. The trial court properly found that they in good faith believed that the matter of the cancellations was a minor problem that could be easily remedied.[7] The existing relationship between Jenkins and Ehrensberger apparently contributed to this belief. Since 1969 Ehrensberger and Mr. Jenkins had enjoyed an amicable business relationship. Both were real estate

---

[7] When Jenkins reminded Wise about property insurance and real property taxes, which were the responsibility of the purchasers, the insurance was obtained and the taxes paid. Regarding the notices of cancellation, Mrs. Wise testified:

Q. His cancellation of the contract was a complete surprise to you?

A. I thought it was. I thought he was probably joking, because he knew I had spent all this time in developing and getting the permits and so forth.

Q. Were there any other reasons that you thought the cancellation was not in fact a firm cancellation or a true cancellation of that contract?

A. Well, I didn't think anybody could just hand somebody a paper and cancel a contract.

brokers on the Island of Kauai, and in late 1969 Jenkins had listed for sale several pieces of property with Ehrensberger as his exclusive agent. For that matter, Ehrensberger was Jenkins' broker in the sale of Parcel 18 to Mrs. Wise and in the sale of Parcel 19 to Mrs. Wise and Ehrensberger. Jenkins' own conduct only served to foster this belief. After serving the notices of cancellation and recording them with the bureau of conveyances, Mr. Jenkins nevertheless chose to mitigate the seeming finality of his actions by writing Wise that "if I do not hear from you by October 6th 1972 this will be placed in the hands of my attorney." It is not entirely clear from the language of the letter whether he intended to have his attorney pursue the collection process further or whether to have him file suit immediately after that date. There is nothing in the record to indicate when and under what instructions Jenkins turned the matter over to his attorney. In any event, suit was not filed until December 29, 1972. Before then, and within a reasonable time after October 6, 1972, Wise and Ehrensberger intended to and would have been able to satisfy the Jenkins agreements of sale in full had not the normal course of escrow in the Wells transaction been interrupted by the discovery and rectification of the defect in Jenkins' title.

We also find no basis for the charge that the purchasers were speculating at the sellers' expense. There is no suggestion that the agreements between the parties were unfair to the sellers, or that the consideration for the sale of Parcels 18 and 19 were inadequate. The payments already made amounted to sixteen per cent of the total purchase price of $100,000.00. The purchasers were assiduously preparing the property for development or for sale. They had already incurred expenditures for architectural plans. Building permits for contemplated improvements on the premises were obtained from the County of Kauai on September 27, 1972. The plans cost them $770.00 and the permits $455.00. On October 2, 1972, they contracted for an appraisal of the property for financing purposes. This cost them $2,500.00. Throughout they, in good faith, were preparing to develop the property themselves, but in the words of Mrs. Wise, the Wells transaction was "too good a deal."

## III

As a further and additional ground for decreeing a cancellation of the agreements of sale and for denying the purchasers' prayer for specific performance, the trial court held that Ehrensberger, as the sellers' broker, had breached his duty of loyalty to Jenkins. The trial court specifically found that at the time the first DROA of March 10, 1971, was entered into between Jenkins and Wise for Parcel 18, with the option to purchase Parcel 19, Ehrensberger did not disclose to Jenkins that "he and Wise were business associates and that he would be acquiring interests in said Parcels 18 and 19." This was also the factual predicate for that part of the trial court's judgment requiring defendant Ehrensberger to repay Jenkins the broker's commissions amounting to $6,000.00 he received from the sale of the property.

A real estate agent may not, without the knowledge and consent of his principal, purchase for himself the property which he has been authorized to sell. *Rosenfeld v. Glick Real Estate Company*, 291 S.W.2d 863 (Mo. 1956); *Sumner v. Jones*, 22 Haw. 391 (1914). Such a transaction is voidable by the principal and will be set aside, regardless of whether there was actual fraud in the transaction, or whether there was undue advantage for the agent or injury to the principal. *Sands v. Eagle Oil Refining Co.*, 83 Cal.App.2d 312, 188 P.2d 782 (1948). *Cf. Sumner v. Jones, supra.*

Jenkins, however, was fully aware of Ehrensberger's role as a purchaser of Parcel 19. The agreement of sale for that parcel expressly named Ehrensberger and Wise as purchasers. Both Wise and Ehrensberger testified unequivocally that the latter did not, and never did have any interest in Parcel 18. Both parcels were being sold to the Wells as a single transaction. The exhibits upon which the court relied for its findings were correspondence (two letters written well over a year following the DROA for Parcel 18) and the Wells DROA, dated October 11, 1972, which necessarily referred to both parcels as a unified whole. Obviously, in such a circumstance a general reference to the property as parcels "we jointly own" was not a clear admission of Ehrensberger's interest in

the property, other than in Parcel 19. Neither was it a sufficient predicate for a finding that, *at the time of the first DROA,* Ehrensberger intended to acquire an interest in Parcel 18, or that Ehrensberger and Wise had reached agreement that the former would be acquiring an interest in either parcel. Unless supported by substantial evidence, a factual determination by the trial court will not be sustained. *Baldwin v. Hawaiian Agronomics Co.,* 53 Haw. 447, 496 P.2d 9 (1972); *Boteilho v. Boteilho,* 58 Haw. 40, 564 P.2d 144 (1977).

IV

The defendant purchasers concede that by virtue of the agreement between the parties, the sellers were entitled to costs and a reasonable attorney's fee. Because of this concession on appeal, we need not decide in this case whether and to what extent HRS § 607-17[8] is determinative of the sellers' entitlement to attorney's fees. The purchasers, however, question the amount awarded by the trial court, as well as the basis upon which it was determined. *See Sharp v. Hui Wahine, Inc.,* 49 Haw. 241, 413 P.2d 242 (1966). We consider the purchasers' contentions to be sufficiently meritorious to warrant a remand on this issue. Attorney's fees provided for by contract or by statute must be reasonable. HRS § 607-17; *Sharp v. Hui Wahine, Inc., supra,* and must have been reasonably and necessarily incurred by the party seeking the award.

---

[8] HRS § 607-17 provides in pertinent part as follows:

"Any other law to the contrary notwithstanding, where an action is instituted in the district or circuit court on a promissory note or other contract in writing which provides for an attorney's fee the following rates shall prevail and shall be awarded to the successful party, whether plaintiff or defendant:

(1) Where the note or other contract in writing provides for a fee of twenty-five per cent or more, or provides for a reasonable attorney's fee, not more than twenty-five per cent shall be allowed;

(2) Where the note or other contract in writing provides for a rate less than twenty-five per cent, not more than the specified rate shall be allowed;

provided that the fee allowed in any of the above cases shall not exceed that which is deemed reasonable by the court."

That part of the judgment requiring defendant Ehrensberger to pay to Jenkins the sum of $6,000.00 is reversed. That part of the judgment relating to attorney's fees is set aside and remanded for a redetermination. In all other respects, the judgment is reversed and the cause remanded for further proceedings consistent herewith. This reversal and remand as to these remaining parts of the judgment, however, is expressly conditioned upon the payment to Jenkins by Wise and Ehrensberger of the entire unpaid balance of the purchase price, together with contractual interest then accrued, within such period as the trial court shall deem meet and reasonable under the circumstances, but in no event shall the period be less than thirty days from the entry of judgment on appeal. Upon payment as decreed herein, the trial court shall order specific performance by Jenkins of the agreements of sale; however, upon failure of the purchasers to perform as herein directed, the judgment of the circuit court, except as to defendant Ehrensberger for reimbursement of broker's commissions received and as to the award of attorney's fees, shall be deemed affirmed.[9]

*Curtis W. Carlsmith (Robert M. Harris* on the brief) for defendants-appellants.

*Clinton I. Shiraishi* for plaintiffs-appellees.

---

[9] While we have said that even where the trial court refuses to grant relief against forfeiture of the vendee's interests in the land, it may nevertheless order a refund of all or a portion of the purchase price already paid, the circumstances would not justify its application in this case. Defendant Ehrensberger is being allowed to retain his broker's commissions, and he and Wise are being allowed to retain the rentals from the property they were receiving while in possession of the premises.