634 P.2d 603 (1981)
KAIMAN REALTY, INC., a Hawaii Corporation, Plaintiff-Appellant, Cross-Appellee,
v.
Duncan William CARMICHAEL, William Langas and Robert George Morrow, Defendants-Appellees, Cross-Appellants.
No. 7431.
Intermediate Court of Appeals of Hawaii.
October 9, 1981.
Reconsideration Denied November 2, 1981.
Certiorari Granted November 20, 1981.
*605 William F. Crockett, Wailuku (Crockett & Nakamura, Wailuku, of counsel), for plaintiff-appellant, cross-appellee.
Edward F. Mason, Wailuku (Mason & Yoshii, Wailuku, of counsel), for defendants-appellees, cross-appellants.
Before HAYASHI, C.J., and PADGETT and BURNS, JJ.
BURNS, Judge.
Plaintiff-Appellant, Cross-Appellee Kaiman Realty, Inc., as Buyer, sued Defendants-Appellees, Cross-Appellants Carmichael, Langas, and Morrow, as Sellers, for specific performance of six condominium apartments sales contracts.
This case considers the rights of a buyer and a seller in a contract for the sale of real property where the buyer fails to perform its obligations on or before the specified closing date.
We affirm the lower court's denial of specific performance. We reverse and remand for further consideration the lower court's order requiring the Sellers to refund the cash deposits to the Buyer and its dismissal of Sellers' counterclaim.
As tenants-in-common, Carmichael, Morrow, and Langas owned apartments 115, 129, 174, 216, and 259 in the Kihei Kai-Nani Phase One condominium in Maui County. Langas owned apartment 244.
Using a separate but identical Deposit Receipt, Offer and Acceptance (DROA)[1] form for each apartment, Buyer, through Edward Neizman, its principal broker, offered to purchase each of the six apartments for $75,000.00 via $15,000.00 in cash and $60,000.00 via a one-year agreement of sale payable at $515.00 per month including 9½ percent simple interest. The DROAs were dated August 31, 1978. Neizman forwarded *606 them to Langas in Vancouver, Canada.
Paragraph 5 of the offers provided as follows:
5. Buyer and Seller shall perform all their obligations set forth herein on or before October 16, 1978. Buyer and Seller both agree that this time may be extended for a period of 30 days at the discretion of the Seller's Broker. All documents shall be recorded within a reasonable time thereafter, and upon such recordation the net proceeds shall be disbursed to Seller.
The Sellers and Langas crossed out the second and third sentences of paragraph 5. They inserted language which specified that interest would run from October 16, 1978, and that Buyer would be responsible for maintenance expenses from October 16, 1978. They reduced the broker's commissions which they were agreeing to pay Buyer, as broker, from $4,000.00 to $2,000.00.
The Sellers signed their counter-offers and Langas brought all six to Maui in the latter part of September. The Buyer, via Neizman, accepted all of them.
The contracts specified in paragraph 11 that "[t]his transaction shall be processed and closed in escrow by Title Guaranty Escrow" (Escrow).[2] On September 28, 1978, Neizman gave Escrow Buyer's $6,000.00 check and the six contracts.
The contracts each specify that "TITLE SHALL VEST AS FOLLOWS: To be determined in Escrow." The Buyer gave Escrow the names of the designated owners, Escrow ordered the agreements of sale and received them on or before October 13, 1978. However, each was drafted as if the designated owners were authorized substitute purchasers. Because the designated owners for apartment 129 were the Buyer and Edgar Nakama[3] as tenants-in-common, the Buyer signed the agreement of sale for apartment 129 but it did so on October 19, 1978. The Buyer was not a designated owner for any of the other apartments and therefore did not sign any of the other agreements of sale. The designated owners delivered signed copies to Escrow and deposited the required cash with Escrow on the following dates:

Apartment Date Signed AOS Date Down Payment
No. Received by Escrow Received by Escrow
 115 10-18-78 10-19-78
 174 10-14-78 10-18-78
 216 10-11-78 10-17-78
 244 10-14-78 10-18-78
 259 10-18-78 10-19-78
 129 10-19-78 10-16-78

Langas, holding special powers of attorney from the Carmichaels and the Morrows, wanted to sign on October 16, 1978, but Escrow was not ready to close. Langas left Maui on the 17th. Escrow was not ready to close all six contracts until the 20th, and on that day they mailed the necessary documents to Langas. Langas did not respond.[4]
On December 12, 1978, Buyer sued Sellers asking for specific performance of the six contracts or, in the alternative, for compensatory and punitive damages for Sellers' refusal to close the transaction.
The Sellers pleaded estoppel as an affirmative defense, filed a counterclaim asking for permission to keep the six $1,000.00 deposits as liquidated damages or, in the alternative, for general, special, and punitive damages caused by Buyer's intentional infliction of mental and emotional distress in the filing of the complaint and lis pendens.
*607 Sellers demanded a jury trial on all issues. Thereafter, the Buyer waived all of its claims for damages and the Sellers agreed to proceed with a non-jury trial solely as to the issue of specific performance. That first portion of the bifurcated trial commenced on February 14, 1979.
The trial court decided that time was of the essence and that the Buyer failed to perform in a timely fashion. It denied Buyer's request for specific performance, dismissed Sellers' counterclaim, and ordered Sellers to refund the deposit because (1) the Buyer was still willing to perform and (2) the Sellers were in a position to sell the properties involved for more than the prices contracted.[5]
Buyer appeals the denial of specific performance. Sellers cross-appeal the dismissal of their counterclaim and the order requiring them to return the $6,000.00 deposit.
Lum v. Stevens, Adm'r'x Soffra Est., 42 Haw. 286 (1958), is authority for the following statements of law:
In a suit for specific performance, principles developed in courts of equity apply. In equity, time is not ordinarily regarded as of the essence of a contract. However time may be made essential. Parties may make it so by express stipulation or by otherwise clearly manifesting their intention that the contract shall be performed on or before a specified day. Where there is a clear manifestation of intention that time shall be of the essence, a party seeking specific performance will generally be denied the remedy unless he has performed or tendered the performance of his obligations within the specified time. [Citations omitted.]
Id. at 288.
Time may be made of the essence of the contract by express stipulation, or even without an express stipulation to that effect where such intention is clearly manifested from the agreement as a whole, construed in the light of the surrounding facts. In either case the court may refuse to decree specific performance where it appears that the plaintiff failed to perform on his part within the stipulated time, unless there is something in the facts to take the case out of the usual rule. [Citations omitted.]
71 Am.Jur.2d, Specific Performance, § 64 (1973).
The same rule of law was applied in Bohnenberg v. Zimmermann, 13 Haw. 4 (1900), as was applied in Lum v. Stevens, Adm'r'x Soffra Est., supra. In both cases the parties did not make time of the essence by express stipulation. In Bohnenberg, the Hawaii Supreme Court held that the intention to make time of the essence was not clearly manifested from the agreement as a whole, construed in the light of the surrounding facts, and it reversed a denial of specific performance. In Lum, it held that the intention to make time of the essence was clearly manifested, and it affirmed a denial of specific performance.
In this case, the lower court was able to refer not only to the contracts and the "surrounding facts," but sans objection it was also presented with a great deal of evidence about the previous negotiations of the parties. Under Okuhara v. Broida, 51 Haw. 253, 456 P.2d 228 (1969), it was entitled to consider this evidence. On the basis of the evidence before it, the lower court found as a fact that "Neizman understood at all times that [Sellers] required as a condition of the contracts that the sales be closed no later than October 16, 1978."
In view of the evidence and the lower court's findings of fact, we agree with its conclusion that time was of the essence.
The next question is whether Buyers breached their covenants to perform all of their contractual obligations by October 16, 1978.[6] Clearly the answer is yes as to all six contracts.
*608 The Buyer is obligated to execute agreements of sale for each apartment. It only executed one and it executed that one three days late. The fact that the contracts allowed the Buyer to designate owners other than itself did not authorize Buyer to substitute for itself other legal persons as obligors under the agreements of sale. Nor did the fact that Sellers agreed to pay Buyer broker's commissions. Sellers accepted Buyer as the one to whom it was willing to extend credit; nowhere did they agree to substitute others without Sellers' consent.
Further, even if the Buyer was authorized to substitute purchasers, none of them executed agreements of sale and paid the required cash payment to Escrow on or before October 16, 1978. Consequently, none of them performed all of their contractual obligations by October 16, 1978, and they have all breached their respective contracts and none are entitled to specific performance.
The next question is whether there is something in the facts of this case to take the case out of the usual rule. The lower court did not think so and neither do we.
Buyer argues that Jenkins v. Wise, 58 Haw. 592, 574 P.2d 1337 (1978),[7] compels a decision in its favor. We disagree. In Jenkins, the Hawaii Supreme Court did not specify whether time was or was not of the essence. Possibly it was not, and in such case, Bohnenberg would be apposite. If time was of the essence, then, unlike this case, its facts required that it be taken out of the usual rule.
The final question is whether the lower court erred in dismissing Sellers' counterclaim. The answer is yes.
The Sellers did not waive their right to a jury trial on the issues raised in their counterclaim. The nonjury trial concerned the Buyer's request for specific performance, not the Sellers' counterclaim, and the lower court erred when it decided the issues raised in the counterclaim.
Further, specifically with respect to Sellers' request that they be awarded the six $1,000.00 deposits as liquidated damages, each contract provides in relevant part as follows:
7. It is expressly understood and agreed: First: In the event Buyer fails to pay the balance of the purchase price or complete the purchase as herein provided, Seller may ... (c) retain the initial deposit, and all additional deposits provided for herein as liquidated damages.
However, the issue is not that simple. First, attention must be directed to the provision in each contract wherein the Sellers agree to pay Buyer, as broker, a commission of $2,000.00 and further agree that if Buyer breaches the contract, then the Sellers would pay to the broker one-half of all sums retained.
Second, it must be determined whether the Sellers are also in breach. If so, then the deposits must be refunded. See n. 6, supra, at 6. For example, under the contracts the Sellers were required to furnish Buyer from a licensed abstractor a Certificate of Title showing good title to the property vested in Buyer. The certificates were not produced until October 17, 1978.
Finally, if the Sellers are not in breach, the ability of the Sellers to enforce the liquidated provision in each contract is subject to the guidelines outlined in Gomez v. Pagaduan, 1 Haw. App. 70, 613 P.2d 658 (1980). There were insufficient facts on the record for the lower court to make the decision under said guidelines.
Affirmed in part and reversed in part.
*609 The portion of the judgment denying specific performance is affirmed.
The portion of the judgment which awards to Buyer all monies deposited in escrow is reversed and this case is remanded for further proceedings consistent with this opinion.
NOTES
[1] Hawaii Association of Realtors 1971 Standard Form.
[2] Escrow's full legal name is Title Guaranty Escrow Services, Inc. The escrow instructions, if any, were not introduced at trial.
[3] Edgar Nakama was Escrow's employee in charge of closing the sales transactions mentioned herein.
[4] Within two weeks after October 16, 1978, the Sellers agreed to sell five of the apartments to other purchasers. On April 11, 1979, the trial court filed its judgment and an order dissolving preliminary injunction and expunging lis pendens. On April 12, 1979, the Sellers deeded away all six apartments. On February 6, 1980, the Hawaii Supreme Court denied Sellers' motion to dismiss appeal on grounds of mootness on the grounds, inter alia, that Sellers failed to prove that the purchasers are bona fide purchasers who took with neither actual nor constructive knowledge of Buyers' claims.
[5] There is no evidence on the record of the value of the properties at the time of trial.
[6] In a contract for the sale of land in which time is of the essence, if both buyer and seller are in breach at the time set for performance, both parties are discharged and the contract will not be enforced. Devine v. Williams Bros., Inc. of Marshfield, 4 Mass. App. 816, 348 N.E.2d 445 (1976); Associated Developers Co., Inc. v. Infanger, 85 Idaho 158, 376 P.2d 496 (1962); Wimer v. Wagner, 323 Mo. 1156, 20 S.W.2d 650 (1929); 3A A. Corbin, Contracts § 663 (1960).
[7] It should be noted that in Jenkins v. Wise, supra, the defaulting buyers on an agreement of sale requested and were allowed a modified specific performance. They were not allowed to resume installment payments under the contract. Rather, they were required to pay the entire unpaid balance of the purchase price, together with contractual interest then accrued.