55 P.3d 827

**HAWAI'I NATIONAL BANK,**
Plaintiff–Appellant,

v.

Brian R. COOK, also known as Brian Richard Cook, dba Windward Self–Storage, Pohukaina Venture; Kona Country Fair Venture, Defendant–Appellees,

First Hawaiian Bank; Bank of Honolulu; Finance Factors, Limited; City and County of Honolulu; United States of America; Federal Savings and Loan Insurance Corporation, Receiver for State Savings and Loan Association; John Does 1–50; Jane Does 1–50; Doe Partnerships 1–50; Doe Corporations 1–50; Doe Entities 1–50 and Doe Governmental Units 1–50, Defendants,

and

Trustees Under the Will and of the Estate of Bernice Pauahi Bishop, Deceased, Intervenor–Appellee,

and

Atlantic National Trust Limited Liability Company, also known as Atlantic National Trust, L.L.C., Intervenors.

Trustees Under the Will and of the Estate of Bernice Pauahi Bishop, Deceased, Plaintiff–Appellee,

v.

Hawai'i National Bank, Defendant–Appellant,

and

Pohukaina Venture, and Brian R. Cook, also known as Brian Richard Cook, Defendant–Appellees,

and

Atlantic National Trust, L.L.C., Ahuimanu Land Corp., United States of America, City and County of Honolulu, John Does 1–50, Jane Does 1–50, Doe Partnerships 1–50, Doe Corporations 1–50, Doe Entities 3–50, and Doe Governmental Units 1–50, Defendants.

No. 22225.

Intermediate Court of Appeals of Hawai'i.

May 16, 2000.

Certiorari Granted June 21, 2000.

Robert M. Ehrhorn, Jr. and Elizabeth A. Kane (Takushi Funaki Wong & Stone), on the briefs, Honolulu, for plaintiff-appellant.

Cheryl A. Nakamura and Earl T. Sato (Rush Moore Craven Sutton Morry & Beh), on the briefs, Honolulu, for intervenor-appellee.

WATANABE, ACOBA, and LIM, JJ.

Opinion of the Court by LIM, J.

Plaintiff–Appellant Hawaii National Bank (HNB) appeals the following actions of the first circuit court: (1) the findings of fact, conclusions of law, and order denying HNB's motion for partial summary judgment and order granting judgment for Intervenor–Appellee Trustees Under the Will and of the Estate of Bernice Pauahi Bishop, Deceased (Bishop Estate), filed October 6, 1998; (2) the judgment thereon of even date; and (3) the deficiency judgment in favor of HNB and against Defendant–Appellee Brian R. Cook, also known as Brian Richard Cook, dba Windward Self–Storage (Cook), filed January 5, 1999.

We affirm.

## I. BACKGROUND

The parties filing briefs in this appeal are Bishop Estate and HNB.

Bishop Estate is the fee simple owner and was the lessor of two lots of commercial real property located in Kaka'ako, Hawai'i (the Kaka'ako Properties). Bishop Estate leased each lot for a forty-year term.

Lease No. 11,249 (Lease 1) commenced on April 1, 1958 and by its terms was to terminate on March 31, 1998. Lease No. 11,251 (Lease 2) commenced on May 1, 1958 and by its terms was to terminate on April 30, 1998. Both Lease 1 and Lease 2 required payment of rent semiannually for the forty-year term.

Pohukaina Venture (Pohukaina) became the lessee of the Kaka'ako Properties pursuant to a March 14, 1978 assignment and thus owed rent to Bishop Estate under Leases 1 and 2 through March 31, 1998 and April 30, 1998, respectively.

At times hereinafter and indiscriminately, we will refer to the leases between Bishop Estate and Pohukaina as the "ground leases," and to the rent due Bishop Estate from Pohukaina under the ground leases as the "ground rent."

HNB was the holder of the following instruments which covered certain properties, including Pohukaina's leasehold interests in the Kaka'ako Properties: (1) a September 29, 1988 promissory note (Note A) in the amount of $1,100,000 and co-signed by Pohukaina, Cook and Kona Country Fair Venture (Kona Country); (2) a mortgage from Pohukaina to HNB securing Note A, which was executed and delivered on August 25, 1988 and recorded on September 28, 1988 (Mortgage A); (3) a July 12, 1989 promissory note (Note B) in the amount of $250,000 and co-signed by Pohukaina, Cook and Kona Country; and (4) a mortgage from Pohukaina to HNB securing Note B, which was executed, delivered and recorded on July 12, 1989 (Mortgage B).

HNB also held, by assignment, a promissory note, first mortgage and collateral assignment of leases from Pohukaina (Collateral Assignment), dated April 25, 1978 and recorded on January 27, 1998, previously held by Atlantic National Trust Limited Liability Company, also known as Atlantic National Trust, L.L.C. (Atlantic),[1] which covered Pohukaina's leasehold interests in the Kaka'ako Properties.

This appeal focuses our attention squarely on the assignment-of-rents provisions found in Mortgage A, Mortgage B and the Collateral Assignment. Hereinafter, the provisions will collectively be referred to as HNB's Assignment of Rents.

Mortgages A and B, with Pohukaina as Mortgagor and HNB as Mortgagee, each provided, in pertinent part, that:

> Mortgagor does hereby mortgage, assign and transfer unto Mortgagee, its successors and assigns, all of its leasehold interest described in Exhibit "A" [which describes the Kaka'ako Properties] attached hereto and made a part hereof.
>
> TO HAVE AND TO HOLD said Indenture of Lease and all the rights, interest and estate of the Mortgagor, both at law and in equity, in and to the premises here-

---

**1.** Atlantic National Trust Limited Liability Company, also known as Atlantic National Trust, L.L.C. (Atlantic) acquired the promissory note, first mortgage and collateral assignment of leases in the following manner.

On or about April 25, 1978, Pohukaina Venture (Pohukaina), through its general partners, executed and delivered to State Savings and Loan Association (State Savings) a promissory note for $600,000. The promissory note was secured by a First Mortgage, Security Agreement and Financing Statement (First Mortgage) from Pohukaina to State Savings, dated April 25, 1978 and recorded on April 28, 1978, which covered the Kaka'ako Properties. As additional security for the promissory note, on April 25, 1978 Pohukaina and State Savings entered into a Collateral Assignment of Lease or Leases (Collateral Assignment), whereby Pohukaina assigned to State Sav-

ings the subleases on the Kaka'ako Property and the rents and incomes derived from those subleases.

By assignment dated September 30, 1996, State Savings assigned the promissory note, First Mortgage and Collateral Assignment to BTD–1996 NPC 1, L.L.C. (BTD), and the assignment was recorded on January 13, 1997. By subsequent assignment dated July 10, 1997, the promissory note, First Mortgage and Collateral Assignment were assigned by BTD to Atlantic.

On August 8, 1997, Atlantic moved to intervene in HNB's foreclosure suit against Pohukaina. On September 8, 1997, the trial court granted Atlantic's motion to intervene. Finally, on December 18, 1997, HNB acquired the promissory note, First Mortgage and Collateral Assignment by an assignment from Atlantic, which was recorded on January 27, 1998.

by demised and all buildings and improvements now or hereafter situate or being on said premises, and all and singular the tenements, hereditaments, rights, privileges and appurtenances thereunto belonging, *and all the rents, issues and profits thereof,* unto the Mortgagee and the successors and assigns of the Mortgagee for and during the remainder of the term of said lease yet to come and unexpired.

. . . .

And [the mortgagor] will punctually pay the rent at the times and in the manner in said lease required[.]

. . . .

*BUT UPON ANY DEFAULT* in the performance or observance of any covenant or condition herein or in any promissory note contained or of the terms of any other indebtedness hereby secured, or if the Mortgagor (or any of them, if there be more than one) is adjudicated a bankrupt or insolvent, or shall file any petition or answer seeking relief as a debtor under any law for the relief or aid of debtors, or shall enter into any arrangement or composition with creditors or if a receiver is appointed with respect to the property herein described, or if the mortgaged property, or any part thereof, shall be seized or levied upon under any legal process or under any claim of legal right, then, in each such event, the whole amount of all indebtedness owing by or chargeable to the Mortgagor under any provision of this mortgage, or intended to be secured hereby, on any and every account, shall at the option of the Mortgagee become at once due and payable without notice or demand, and *with or without foreclosure the Mortgagee shall have the immediate right to receive and collect all rents and profits due or accrued or to become due, and said rents and profits are hereby assigned to the Mortgagee,* and said Mortgagee is hereby irrevocably appointed the attorney in fact of the Mortgagor with power in the name of the Mortgagor or the Mortgagee to demand, sue for, collect, recover and receive all such rents and profits, to compromise and settle claims for rents or profits upon such terms and conditions as may seem proper[.]

(Emphasis on the assignment of rents clauses added).

Mortgages A and B also each included a "consent and estoppel certificate" from Bishop Estate, providing:

That the [Bishop Estate], . . . [does] hereby consent to the execution of the within and foregoing Mortgage by [Pohukaina], as Mortgagor, in favor of [HNB], as Mortgagee, upon the express conditions, however, that this consent shall not authorize, nor be deemed to authorize, any further or other assignment or mortgage of said leases and that should there be any conflict between the terms of said leases and the terms of said Mortgage, the former shall control, and that nothing herein shall be construed as being a waiver of any of the terms, covenants and conditions of said leases.

The Collateral Assignment assigned to HNB "all rents, income and profits" arising from the Kaka'ako Properties.

The Collateral Assignment further provided that:

So long as there shall exist no default by the assignor . . . the assignor shall have the right to collect . . . all rents, income and profits arising under said lease or from the premises described therein and to retain, use and enjoy the same.

However:

*[u]pon or at any time after default* in the payment . . . *the assignee* without in any way waiving such default *may at its option* without notice and without regard to the adequacy of the security for the said principal sum, interest and indebtedness secured hereby and by said note and mortgage, either in person or by agent, with or without bringing any action or proceeding, or by a receiver appointed by a court, take possession of the premises described in said lease and/or mortgage and have, hold, manage, lease and operate the same on such terms and for such period of time as the assignee may deem proper and either with or without taking possession of said premises in its own name, demand, sue for

or otherwise *collect and receive all rents, income and profits of said premises,* including those past due and unpaid. . . .

(Emphasis on the assignment of rents clause added.)

## II. PROCEDURAL HISTORY

On October 4, 1996, HNB filed a complaint for foreclosure on the Kakaʻako Properties (Civil Number 96–4088). The complaint named, among others, Pohukaina, Cook, and Kona Country as defendants because each party had failed to make payments on its mortgage loans. In particular, HNB alleged that as of October 15, 1996, Pohukaina, Cook, and Kona Country owed the following:

Note A:
| | |
|---|---|
| Principal | $889,586.21 |
| Interest from 7/30/96 to 10/15/96 at 10.75% per annum. | 20,258.71 |
| Late charges | 2,280.00 |
| Total as of 10/15/96 | $912,124.92 |

plus a per diem interest accrual of $261.29 per day for each day after October 15, 1996 until paid.

Note B:
| | |
|---|---|
| Principal | $187,191.96 |
| Interest from 7/30/96 to 10/15/96 at 10.25% per annum. | 4,233.56 |
| Late Charges | 240.00 |
| Total as of 10/15/96 | $191,665.52 |

plus a per diem interest accrual of $54.98 per day for each day after October 15, 1996 until paid.

HNB did not name Bishop Estate as a defendant in the foreclosure action.

On November 22, 1996, HNB filed a motion for summary judgment and for interlocutory decree of foreclosure against all parties.

On February 14, 1997, the trial court issued its findings of fact, conclusions of law, and order granting HNB's motion for summary judgment and for interlocutory decree of foreclosure against all parties. Judgment thereon was also filed on February 14, 1997.

The February 14, 1997 order appointed Glenn Okada (the Commissioner) as commissioner for the Kakaʻako Properties. The order provided, in relevant part:

6. That Glenn Okada . . . is hereby appointed commissioner of this Court as to the . . . Kakaʻako properties and as commissioner is authorized and directed to make the sale at foreclosure as herein set forth. Said commissioner shall file herein an accurate accounting of all his receipts and expenses and shall be awarded such fees as to this Court shall determine to be reasonable. The costs and fees of the commissioner shall be secured by the lien of Plaintiff's mortgages on the properties. ·

. . . .

10. That pending the hearing on the confirmation of the sales herein authorized, the [Commissioner] shall receive and collect all rents and shall be authorized to compromise and settle claims for rents, upon such terms and conditions as to Plaintiff may seem proper, and to enter into, renew or terminate leases or tenancies.

The Commissioner began collecting rents from subtenants on the Kakaʻako Properties. On June 17, 1997, the Commissioner filed a motion for instructions asking the trial court how to distribute the rent money he had collected.

On October 1, 1997, Bishop Estate filed a separate lawsuit to cancel the ground leases (Civil No. 97–4011). Bishop Estate also intervened in the foreclosure proceedings. On November 17, 1997, the two actions were consolidated.

On November 26, 1997, Bishop Estate filed its motion for partial summary judgment, seeking cancellation of the ground leases.

On January 26, 1998, the trial court granted partial summary judgment to Bishop Estate, canceling the ground leases as of January 26, 1998 and granting a money judgment against Pohukaina and its general partners, Cook and Ahuimanu Land Corp., for unpaid ground rent.[2] By cancellation of the ground leases, Bishop Estate regained possession of the Kakaʻako Properties. No foreclosure

---

**2.** The circuit court held Cook and Ahuimanu Land Corp. jointly liable as general partners for the debts of Pohukaina pursuant to Hawaiʻi Revised Statutes (HRS) § 425–115(b) (1998), which states that all partners are liable "[j]ointly for all other debts and obligations of the partnership[.]"

auction of the ground leases had been scheduled before the cancellation.

On February 2, 1998, HNB filed a motion for partial summary judgment, seeking an order directing the Commissioner to pay it the rent money he had collected from the subtenants, pursuant to the Assignment of Rents. Bishop Estate opposed the motion, contending that it was entitled to the rent generated by the Kaka'ako Properties, ahead of HNB, to pay its overdue ground rent.

On April 1, 1998, the Commissioner filed his report. The Commissioner reported that from March 1997 until cancellation of the ground leases in January 1998, he had collected a total income of $443,830.85 from the Kaka'ako Properties, yielding a net income of $363,303.59 to be distributed among the parties as directed by the trial court.

The Commissioner also reported that realtors, potential investors and other parties interested in the Kaka'ako Properties had been concerned because the ground leases were to have expired according to their respective terms in March 1998 and April 1998.

In an attempt to assuage such concerns, the Commissioner had met with Bishop Estate to discuss the possibility of extending the ground leases or negotiating new leases with potential buyers, but Bishop Estate had already decided to take back the Kaka'ako Properties upon expiration of the ground leases.

Based upon his consultations with experts in the field of commercial real estate, affected parties in the foreclosure action, his own attorney and parties interested in the Kaka'ako Properties, the Commissioner opined that "the Kaka'ako Property was not marketable, and the time and considerable cost of auctioning the Kaka'ako Property would not benefit any of the parties in this case."

On April 6, 1998, the trial court heard HNB's motion for partial summary judgment concerning distribution of the subtenant rents collected by the Commissioner. On October 6, 1998, the trial court entered its findings of fact, conclusions of law, and order denying HNB's motion for partial summary judgment, and order granting judgment for Bishop Estate. Judgment thereon was filed the same day.

The trial court found that Bishop Estate was owed the following ground rent under the ground leases, prorated to the January 26, 1998 date of cancellation of the ground leases:

Lease 1: $106,192.07

Lease 2: 114,520.00

Total: $220,712.07

The trial court ordered that the $363,303.59 net income from the Kaka'ako Properties, be paid in the following order: (1) to the Commissioner, $18,031.00 for fees and costs; (2) to the attorney for the Commissioner, $10,041.70 for attorney's fees; (3) to Bishop Estate, $220,712.07 for the ground rents due on the Kaka'ako Properties; and (4) to HNB, the remainder of the money, $114,518.82.

On October 26, 1998, HNB appealed the October 6, 1998 judgment distributing the subtenant rents.

On January 5, 1999, the trial court entered a deficiency judgment in favor of HNB and against Pohukaina, Cook and Kona Country.

On January 14, 1999, the Hawai'i Supreme Court dismissed HNB's appeal of the October 6, 1998 judgment because the record on appeal did not reflect the January 5, 1999 deficiency judgment.

On January 15, 1999, HNB filed a timely notice of this appeal.

### III. STANDARD OF REVIEW

In this appeal, HNB and Bishop Estate dispute conclusions of law made upon undisputed facts.

We review the trial court's [COLs] *de novo* under the right/wrong standard. *Raines v. State,* 79 Hawai'i 219, 222, 900 P.2d 1286, 1289 (1995). 'Under this ... standard, we examine the facts and answer the question without being required to give any weight to the trial court's answer to it.' *State v. Miller,* 4 Haw.App. 603, 606, 671 P.2d 1037, 1040 (1983). *See also Amfac, Inc. v. Waikiki Beachcomber Inv. Co.,* 74 Haw. 85, 119, 839 P.2d 10, 28, *reconsidera-*

*tion denied,* 74 Haw. 650, 843 P.2d 144 (1992). Thus, a [COL] 'is not binding upon the appellate court and is freely reviewable for its correctness.' *State v. Bowe,* 77 Hawai'i 51, 53, 881 P.2d 538, 540 (1994) (citation omitted).

*State v. Medeiros,* 89 Hawai'i 361, 364, 973 P.2d 736, 739 (1999) (internal quotation marks and citations omitted).

██ However, a court sitting in equity on a foreclosure will attempt to do equity. This is a matter "addressed to the sound discretion of the trial court, and its decision will not be set aside unless manifestly against the clear weight of the evidence." *Jenkins v. Wise,* 58 Haw. 592, 598, 574 P.2d 1337, 1342 (1978) (citing *First Hawaiian Bank v. Smith,* 52 Haw. 591, 483 P.2d 185 (1971)).

## IV. DISCUSSION

██ HNB contends the trial court erred in making the following conclusions of law:

E. From the rental proceeds collected in connection with the Kakaako Properties, the Commissioner is obligated to pay to [Bishop Estate] all ground lease rent, expenses and other sums owed to [Bishop Estate] through January 26, 1998 as provided by the [ground leases].

F. Said payment by the Commissioner to [Bishop Estate] is to be made prior to payments to be made by the Commissioner to HNB, as mortgagee, in connection with the mortgages.

Hence the sole issue before us is whether the trial court erred in concluding that Bishop Estate's claim to the subtenant rents from the Kaka'ako Properties to satisfy its unpaid ground rent was superior to HNB's claim to the same subtenant rents to satisfy its mortgage arrears.

HNB asserts it was entitled to first *pro tanto* payment from the subtenant rents. Its primary argument on appeal is that:

HNB ... has a right to the rents from subtenants, by virtue of [the] [A]ssignment of [R]ents which was consented to by Bishop Estate, and which was reduced to possession by the court's appointment of the [Commissioner] to collect the rents from subtenants in aid of HNB's [A]ssignment

of [R]ents. In contrast, Bishop Estate's [ground] leases did not purport to give it a lien on those rents. Bishop Estate has no legal claim to the rents, nor does it have an equitable claim superior to HNB's perfected security interest.

. . . .

In sum, HNB had a security interest in rents from subtenants, which has been perfected and reduced to possession. Bishop Estate consented to that security interest. The Court should give effect to that security interest.

Essentially and at the risk of oversimplification, HNB's argument is an argument at law pitting its lien theory of distribution against what it avers is at most a claim in equity.

If HNB's argument is taken to its logical conclusion, we can agree that HNB had an enforceable legal right to the subtenant rents pursuant to its Assignment of Rents. But this right was reduced, if at all, to constructive possession, with the Commissioner holding actual possession of the Kaka'ako Properties.

To bridge the gap between legal right and enjoyment, HNB must further contend with the equitable nature of a foreclosure, as well as the Commissioner's duty and allegiance therein.

Thus we believe that HNB's argument, even if taken on its own terms as far as it can go, does not take HNB far enough.

In this appeal we decide that HNB's legal lien rights in the subtenant rents must be subordinate to the equitable obligation of the Commissioner, assumed by virtue of his actual possession of the Kaka'ako Properties, to preserve the underlying property interest by applying the subtenant rents to pay Bishop Estate its ground rents. Indeed, were it HNB instead in actual possession, it would be under the same equitable obligation.

We in any event surmise that if the ground leases were not at the end of their respective terms and therefore unmarketable, HNB would be not only duty-bound but eager to have Bishop Estate's ground rents paid.

The exceptional circumstances of this case do not convince us to reach a different result.

In section A of this discussion, we assume for the nonce and *arguendo* that HNB's legal lien theory of the case is worthwhile. We analyze HNB's Assignment of Rents, which determines whether HNB had a legal right to receive rental proceeds from the Kakaʻako Properties. We further consider whether HNB acquired the kind of possession of the Kakaʻako Properties enabling it to do so on a priority basis.

In section B, we discuss the nature of a foreclosure and the rights and duties of the foreclosure Commissioner.

Finally, in section C, we discuss the relative rights and duties of HNB and the Commissioner, which will ultimately illuminate the proper distribution of the net income from the Kakaʻako Properties.

## A. THE ASSIGNMENT OF RENTS

HNB contends it has a legal and prior right to the subtenant rents pursuant to its Assignment of Rents. We assume for the sake of this discussion that, in the foreclosure context, there is profit in HNB's legal lien theory approach.

■ An assignment-of-rents provision is a common fellow traveler to a commercial property mortgage. Such an assignment, included in the mortgage itself or in a separate document, attempts to give the mortgagee an interest in the rents flowing from the mortgaged property.

■ The United States Supreme Court, in *Butner v. United States*, 440 U.S. 48, 54–57, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979), determined that the right to collect rents pursuant to an assignment of rents is subject to the laws of the state in which the mortgaged property is located. Accordingly, we must apply Hawaiʻi law. *See, e.g., In re Jason Realty, L.P.*, 59 F.3d 423 (3d Cir.1995); *In re 163rd Street Mini Storage, Inc.*, 113 B.R. 87 (Bankr.S.D.Fla.1990).

Hawaiʻi law provides very little guidance in analyzing the effect of assignment-of-rents clauses.[3] Understanding whether the Assignment of Rents gave HNB an enforceable right to collect the subtenant rents therefore requires a basic understanding of mortgage law in Hawaiʻi and a survey of the interpretation and effect of assignment-of-rents provisions in various jurisdictions.

### 1. Hawaiʻi Mortgage Law

■ Hawaiʻi mortgage law is based on the lien theory of mortgages. *See FHLMC v. Transamerica Ins. Co.*, 89 Hawaiʻi 157, 164, 969 P.2d 1275, 1282 (1998) (stating that "Hawaiʻi law is based on the lien theory of mortgages."); *see also Adair v. Kona Corp.*, 51 Haw. 104, 110, 452 P.2d 449, 453 (1969).

Under the lien theory of mortgages, "the mortgagee is regarded as owning a security interest only and both legal and equitable title remain in the mortgagor until foreclosure." *Restatement (Third) of Property* § 4.1(a) at 278 (1999).[4]

It follows that in Hawaiʻi the mortgagee's status is that of a lien holder. The mortgagee is not the owner of the property and upon default is therefore not entitled, without more, to possession, rents or profits. *See* 1 Grant S. Nelson and Dale A. Whitman, *Real Estate Finance Law* § 4.2 at 154 (3d ed.1993); *Taylor v. Brennan*, 621 S.W.2d 592 (Tex.1981); *In re Kurth Ranch*, 110 B.R. 501 (Bankr.D.Mont.1990).[5]

---

3. A few Hawaiʻi cases briefly mention the existence of assignment-of-rents provisions. *See, e.g., Motion Picture Indus. Pension Plan v. Hawaiian Kona Coast Assoc.*, 9 Haw.App. 42, 823 P.2d 752 (1991); *Smith v. Smith*, 56 Haw. 295, 535 P.2d 1109 (1975); *Ako v. Russell*, 32 Haw. 769 (1933); *Christian v. Waialua Agr. Co.*, 31 Haw. 817 (1931). Hawaiʻi case law lacks, however, any substantial analysis of such assignments.

4. This is consistent with Hawaiʻi Revised Statutes (HRS) § 506–1 (1999), which provides that a mortgage "shall create a lien only as security for the obligation and shall not be deemed to pass title[,]" and HRS § 506–5 which states that "[i]n the absence of an agreement to the contrary, the mortgagor of real property or fixtures under a duly recorded mortgage is entitled to the use or possession thereof until·default."

5. *Taylor v. Brennan*, 621 S.W.2d 592 (Tex.1981) held that "[u]nder this [lien] theory the mortgagee is not the owner of the property and is not entitled to its possession, rentals or profits." *Id.* at 593.

In embracing the lien theory of mortgages, Hawai'i joins the substantial majority of states. At least thirty-four of the fifty states follow the lien theory of mortgages.[6] The remaining states apply either the title theory, an intermediate theory or some mixture of the three.

■ "Under the title theory, legal 'title' to the mortgaged real estate remains in the mortgagee until the mortgage is satisfied or foreclosed[.] ... Under the intermediate theory, legal and equitable title remain in the mortgagor until a default, at which time legal title passes to the mortgagee." *Restatement (Third) of Property* § 4.1(a) at 278.

### 2. "Absolute Assignments" vs. "Security Interest Assignments"

Assignment-of-rents provisions receive varied treatment among the different jurisdictions. In jurisdictions applying the lien theory of mortgages, it has become common practice to include assignment-of-rents clauses in mortgages, thus purporting to grant the mortgagee additional security for the debt. *See* 4 Richard R. Powell, *Powell on Real Property* § 37.26[3]a at 171–172 (Rohan ed.1999).

United States jurisdictions recognize two basic forms of assignments, "absolute assignments" and "security interest assignments."

■ a. *Absolute Assignment.* An "absolute assignment" gives the mortgagee immediate title to the rents, but postpones the mortgagee's right to collect rental income until the happening of a specific condition, usually the mortgagor's default. *See* 4 Powell § 37.26[3] at 172; *Fed. Deposit Ins. Corp. v. Int'l Property Management,* 929 F.2d 1033 (5th Cir.1991) (interpreting Texas law and holding that an absolute assignment gives immediate title to rent proceeds to the mortgagee, subject to postponement of enjoyment of rent proceeds until mortgagor default); *accord In re Jason Realty, L.P.,* 59 F.3d 423 (3rd Cir.1995) (applying New Jersey law); *In re Gould,* 78 B.R. 590 (D.Idaho 1987).

Therefore, under an absolute assignment the mortgagee's right to the rental proceeds is self-executing, and upon default the mortgagee is not required to take any further action to enforce its right.

■ b. *"Security Interest Assignment"* A "security interest assignment" does not pass title to the rents to the mortgagee. Rather, the assignment creates a lien on the rents generated from the mortgaged property as additional security for the debt. *See* 12 David A. Thomas, *Thompson on Real Property* § 101.02(c)(3) at 365 (1999); *Restatement (Third) of Property* at § 4.2 cmt. a; *see also The Cadle Co. v. Collin Creek Phase II Assoc. Ltd.,* 998 S.W.2d 718 (Texas 1999); *In re Cadwell's Corners Partnership,* 174 B.R. 744 (Bankr.N.D.Ill.1994).

■ Unlike an absolute assignment, this type of assignment is not self-executing. In order to enforce the right to collect rents, the mortgagee must take further action. In most states, the mortgagee's right to enjoyment of the rents hinges on the concept of possession, in effect encompassing the rule that "rents are incident to possession." *In re Embassy Properties North, Ltd. Partnership,* 196 B.R. 172, 178 (Bankr.D.Kan.1996) (applying Missouri law).[7] In fact, some states view absolute assignments as an attempt to contract around this rule. *See In re Hall Colttree Assoc.,* 146 B.R. 675, 678 (Bankr.E.D.Va.1992) (applying Virginia law);

---

6. The following states reportedly follow the lien theory of mortgages: Alaska, Arizona, California, Colorado, Delaware, Florida, Georgia, Hawai'i, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana (civil law), Michigan, Minnesota, Missouri, Montana, Nebraska, Nevada, New Mexico, New York, North Dakota, Oklahoma, Oregon, South Carolina, South Dakota, Texas, Utah, Washington, West Virginia, Wisconsin and Wyoming. *See Restatement (Third) of Property* § 4.1 cmt. a at 285–303; 1 Grant S. Nelson and Dale A. Whitman, *Real Estate Finance Law,* § 4.2 at 154 n.1.

7. The following cases echo the same rule: *In re Cadwell's Corners Partnership,* 174 B.R. 744, 752 (Bkrtcy.N.D.Ill.1994) (applying Illinois law); *In re Century Inv. Fund VIII Ltd. Partnership,* 937 F.2d 371, 376 (7th Cir.1991) (applying Wisconsin law); *In re Park at Dash Point L.P.,* 121 B.R. 850, 856 (Bankr.W.D.Wash.1990) (applying Washington law); *In re Ziegler,* 65 B.R. 285, 286 (Bankr. D.S.D.1986) (applying South Dakota law); *First Fed. Sav. of Arkansas, FA v. City of Nat'l Bank of Fort Smith, Arkansas,* 87 B.R. 565, 567 (W.D.Ark. 1988) (applying Arkansas law).

*The Cadle Co.*, 998 S.W.2d at 721–722 (applying Texas law).

Thus the mortgagee with a security interest assignment must exert some form of possessory right upon the property in order to be entitled to the rental income. The majority of states addressing security interest assignments hold that the mortgagee obtains the right to collect rents either by obtaining actual possession of the property or by securing the appointment of a receiver. *See In re Cadwell's Corners Partnership*, 174 B.R. at 752–53 (applying Illinois law); *In re Park at Dash Point L.P.*, 121 B.R. 850, 856 (Bankr.W.D.Wash.1990) (applying Washington law); *In re Century Inv. Fund VIII Ltd. Partnership*, 937 F.2d 371, 376 (7th Cir.1991) (applying Wisconsin law); *In re Miller*, 133 B.R. 882, 884 (Bankr.N.D.Ohio 1991) (applying Ohio law); *In re Ziegler* 65 B.R. 285, 287 (Bankr.D.S.D.1986) (applying South Dakota law); *In re Ventura–Louise Properties*, 490 F.2d 1141, 1143 (9th Cir.1974) (applying California law).

Other states have, however, relaxed the requirements somewhat, providing that merely "some equivalent action" is sufficient to secure possession. *In re Northwest Commons, Inc.*, 136 B.R. 215, 218 (Bankr. E.D.Mo.1991) (applying Missouri law); *accord Taylor*, 621 S.W.2d at 594 (applying Texas law). Such equivalent action may include giving notice to the mortgagor or the tenants that the mortgagee is enforcing its right to the rents, *see Bevins v. Peoples Bank & Trust Co.*, 671 P.2d 875, 879 (Alaska 1983) (applying Alaska law); *In re Northwest Commons, Inc.*, 136 B.R. at 218 (applying Missouri law), or sequestering rents. *See In re Flower City Nursing Home, Inc.*, 38 B.R. 642, 645 (Bankr.W.D.N.Y.1984) (applying New York law).

In contrast, a handful of jurisdictions do not predicate the right to rents on possession. In particular, North Dakota expressly declines to follow the majority, requiring only "some form of affirmative action by a creditor to fully establish that interest [in the rents]." *In re Fluge*, 57 B.R. 451, 454 (Bankr.D.N.D.1985).

In sum, a security interest assignment does not pass title and is not self-executing. Rather, it creates a lien on the rental income and requires further mortgagee action to enforce the right to collect the rents.

### 3. Treatment of "Absolute Assignments" and "Security Interest Assignments" in Different Jurisdictions

There is little uniformity among jurisdictions as to which form of assignment they recognize, regardless of whether a state follows the lien, title or intermediate theory of mortgage law.

There are a number of states which construe an assignment as either an absolute assignment or a security interest assignment, depending upon its conformance with governing statutory language and the court's inclination to interpret the language in favor of an absolute assignment.

Texas, for example, which follows the lien theory of mortgages, is less inclined to interpret an assignment of rents as absolute. Thus "Texas, for public policy reasons, requires especially clear evidence that the parties intended to create such an [absolute] assignment." *Federal Deposit Ins. Corp. v. Int'l Property Management*, 929 F.2d 1033, 1036 (5th Cir.1991); *cf. In re Charles D. Stapp of Nevada, Inc.*, 641 F.2d 737, 739 (9th Cir.1981) (utilizing a strictly textual approach to deciding whether, in Nevada, an assignment of rents is absolute or gives a mere security interest).

A significant number of states refuse altogether to recognize the validity of an absolute assignment, preferring instead to interpret assignments that are absolute on their face as security interest assignments.

Georgia, another lien theory state, follows the principle that "[u]nder an absolute assignment, a grantee only obtains a conditional right to rents as a type of security[.]" *In re Polo Club Apartments Assoc. Ltd. Partnership*, 150 B.R. 840, 850 (Bkrtcy.N.D.Ga. 1993); *accord In re Flower City Nursing Home, Inc.*, 38 B.R. at 645 (applying New York law); *Galleria Towers, Inc. v. Crump Warren & Sommer, Inc.*, 831 P.2d 908, 911 (1991) (applying Colorado law).

In addition, California in 1996 abolished the distinction between absolute assignments and security interest assignments, providing that all assignments require further mortgagee action to enforce the right to rental income. *Thompson on Real Property* § 101.02(c)(3) at 366 (Supp.1999).

With this understanding of mortgage law in Hawai'i and the variegated treatment of assignment-of-rents provisions in other jurisdictions, we can view HNB's Assignment of Rents with some perspective.

### 4. HNB's Right to Receive Rental Income Pursuant to the Assignment of Rents

If HNB's Assignment of Rents was an absolute assignment, HNB had an enforced, present interest in the rents as a result of Pohukaina's default.

If HNB's Assignment of Rents was a security interest assignment, it was incumbent upon HNB to take further action upon Pohukaina's default to enforce its right to collect the rents. In the vast majority of states, the appointment of the Commissioner would be sufficient to enforce this right. By appointment of the Commissioner, HNB effectively enforced the Assignment of Rents and had a present right to collect the rental income.

In sum, whether HNB's assignment of rents is construed as an absolute assignment or a security interest assignment, the result is the same. Under the logic of its lien theory approach, HNB had a present right to collect the rental proceeds.

Between right and enjoyment stood, however, the practical problem of enforcement of the present right, which is the problem of possession.

The jurisdictions are split as to whether a mortgagee who secures the appointment of a receiver or commissioner also acquires possession of the mortgaged property.

Some courts conclude that the appointment of a commissioner prevents the mortgagee from taking possession. For example, a court applying Ohio law in *In re Sam A. Tisci*, 124 B.R. 46, 49 (Bankr.N.D.Ohio 1991), stated that "a receiver was appointed by the state court which thereby prevented it [the mortgagee] from acquiring actual possession."

Furthermore, other courts state that a mortgagee may enforce its interest in the rents *either* by taking actual possession of the mortgaged property *or* by securing the appointment of a receiver, thus implying that engaging one option precludes the other. *See In re Cadwell's Corners Partnership*, 174 B.R. at 752–53 (applying Illinois law); *In re Park at Dash Point L.P.*, 121 B.R. at 856 (applying Washington law); *In re Century Inv. Fund VIII Ltd. Partnership*, 937 F.2d at 376 (applying Wisconsin law); *In re Miller*, 133 B.R. at 884 (applying Ohio law); *In re Ziegler*, 65 B.R. at 287 (applying South Dakota law); *In re Ventura–Louise Properties*, 490 F.2d at 1143 (applying California law); *In re Hall Colttree Assoc.*, 146 B.R. at 677 (applying Virginia law).

On the other hand, there are a number of jurisdictions which contemplate possession by both the commissioner and the mortgagee. In essence, the commissioner appointed by the court takes actual possession, while the mortgagee takes constructive possession, of the mortgaged premises. *See Democratic Cent. Comm. of D.C. v. Washington Metro. Area Transit Comm'n*, 21 F.3d 1145, 1150, 305 U.S.App.D.C. 397, 402 (1994) (stating that "[i]n order to [enforce] a security interest in possession of property carrying rental payments, the mortgagee must acquire either *actual possession* of the underlying property or *constructive possession such as by the appointment of a receiver* [ ]") (emphasis added); *accord First Fed. Sav. of Arkansas, FA v. City of Nat'l Bank of Fort Smith*, 87 B.R. 565, 567 (W.D.Ark.1988) (applying Arkansas law); *In re Fluge* 57 B.R. at 454 (applying North Dakota law); *In re Cadwell's Corners Partnership*, 174 B.R. at 752–53 (applying Illinois law); *In re Park at Dash Point, L.P.*, 121 B.R. at 856 (applying Washington law).

Accordingly and in any event, upon appointment of the Commissioner, HNB had, at most, constructive possession of the Kaka'ako Properties.

However, as we have noted and as a practical matter, "rents are incident to possession." *In re Embassy Properties North,*

*Ltd. Partnership*, 196 B.R. at 178. And it does not necessarily follow that HNB's present legal right to collect the rental proceeds dictated that the Commissioner in actual possession of the Kaka'ako Properties pay them over to HNB.

If we were to accept HNB's lien theory approach to foreclosure cases, the Commissioner appointed by the court was simply HNB's proxy—and nothing else—whose only duty with respect to the rental proceeds was to pay them over to HNB. This view obtains, however, only if we conceive of the foreclosure as an action purely at law, and the duty of the court and its Commissioner as a purely ministerial one of applying and carrying out a completely deterministic syllogism of lien rules and priorities. We discern very clearly, however, numerous reasons for rejecting that view.

## B. APPOINTMENT OF THE COMMISSIONER

A foreclosure action is not simply the track for the locomotive of the mortgagee's lien rights. If it were purely an action at law, then we might agree that the inexorable logic of lien rights and priorities must prevail. A foreclosure action is, however, significantly more. It partakes of other qualities, as it is equitable in nature.

It is well settled that a mortgage foreclosure is "a subject-matter very clearly within the cognizance of a court of equity." *Honolulu Plantation Co. v. Tsunoda*, 27 Haw. 835, 840 (1924).

Modern court rules cannot obscure its fundamental nature. "Before the adoption in 1952 of [Hawaii Rules of Civil Procedure] Rule 2 calling for 'one form of action to be known as 'civil action'[,]' the statute authorizing foreclosures by action compelled such suits to be brought in equity. *See* Revised· Laws of Hawaii (RL) 1945, § 12420; RL 1935, § 4720; RL 1925, § 2887." *Bank of Hawaii v. Horwoth*, 71 Haw. 204, 213 n. 9, 787 P.2d 674, 680 n. 9 (1990).

As such, "[c]ourts of equity have the power to mold their decrees to conserve the equities of the parties under the circum-. stances of the case." *Honolulu, Ltd. v.*

*Blackwell*, 7 Haw.App. 210, 219, 750 P.2d 942, 948 (1988).

In particular and more to the point of this case, where strict adherence to the terms of an agreement between the parties would be "harsh and unreasonable under the circumstances," the court sitting in equity on a foreclosure case will attempt to do equity. *Jenkins*, 58 Haw. at 597–98, 574 P.2d at 1341. For example,

> [s]trict foreclosure pursuant to the provisions of an agreement of sale has the effect of divesting the purchaser of his equitable interest in the property, as well as any ·right he may have to recover any moneys he has paid on account of the purchase price. Equity, however, abhors forfeitures and where no injustice would thereby result to the injured party, equity will generally favor compensation rather than forfeiture against the offending party.

*Id.* at 596–97, 574 P.2d at 1341 (citations omitted). It is precisely the point of this case that

> [o]ne of the glories of equity jurisprudence is that it is not bound by the strict rules of the common law, but can mold its decrees to do justice amid all the vicissitudes and intricacies of life. The principles upon which it proceeds are eternal; but their application in a changing world will necessarily change to meet changed situations.

*Fleming v. Napili Kai, Ltd.*, 50 Haw. 66, 70, 430 P.2d 316, 319 (1967). *See also Bank of Hawaii v. Davis Radio Sales & Service*, 6 Haw.App. 469, 480–81, 727 P.2d 419, 427 (1986) ("Equity jurisprudence is not bound by strict rules of law, but can mold its decree 'to do justice[.]' ") (quoting *Fleming, supra*).

A court sitting in equity on a foreclosure case "has the plenary power to fashion a decree to conform to the equitable requirements of the situation." *Jenkins*, 58 Haw. at 598, 574 P.2d at 1342 (citation omitted). And "whether and to what extent relief should be granted rests within the sound discretion of the trial court[.]" *Id.* at 597, 574 P.2d at 1341 (citations omitted).

As a practical matter, the court must exercise its equitable powers, pending final reso-

lution of a foreclosure, through its appointed commissioner.

It is well settled that a commissioner is a neutral party appointed by the court and acts as an arm of the court. We have stated that "the commissioner is an agent acting in the court's behalf[.]" *Hoge v. Kane*, 4 Haw. App. 533, 539, 670 P.2d 36, 40 (1983).

As a neutral party, the commissioner does not act at the behest of the mortgagee, the mortgagor or any other interested party. *See* 4 *Powell on Real Property* § 37.26[3][b] at 174 ("The receiver is an officer of the court. He must account to the court and act at the direction of the court."); *Federal Home Loan Mortg. Corp. v. Spark Tarrytown, Inc.*, 829 F.Supp. 82, n. 6 (S.D.N.Y. 1993) ("A receiver is not the agent of the mortgagee, or the party who sought his appointment, but is solely an arm of the court.").

More to the point, "[m]onies that come into a receiver's possession are not the monies of the mortgagee, but monies in the custody of the court." *In re Allen–Main Assoc. Ltd. Partnership*, 223 B.R. 632, 634 (Bankr.D.Conn.1998).

Furthermore, the commissioner takes possession of the mortgaged property and preserves the property for the benefit of the person or entity subsequently entitled to it. *See* 1 *Real Estate Finance Law*, § 4.33 at 235 (stating that a receiver takes "possession of the mortgaged property to repair or preserve the property and to collect rents"), *Anes v. Crown Partnership*, 932 P.2d 1067, 1069, 113 Nev. 195, 199 (1997) ("Customarily, a receiver is a neutral party appointed by the court to take possession of property and preserve its value for the benefit of the per-

son or entity subsequently determined to be entitled to the property.") (citation omitted).[8]

Pursuant to the February 14, 1997 foreclosure decree in this case ("the Commissioner shall receive and collect all rents"), the Commissioner properly took actual possession of the Kaka'ako Properties and collected rent from the subtenants. Moreover, by virtue of his appointment, the Commissioner assumed the duty to preserve the mortgaged property for the benefit of all concerned.

The duty to preserve the mortgaged property necessarily included the duty to pay the ground rent to Bishop Estate. If the ground leases were terminated because the ground rent was not paid, there would no longer be any property subject to the mortgage. In other words, if the ground rent was not paid, the mortgaged property would have been extirpated rather than preserved.

Accordingly, the Commissioner was obligated to preserve the Kaka'ako Properties by paying the ground rent to Bishop Estate. And the only fund he had available to fulfill this obligation was the subtenant rents he had collected.

## C. THE RELATIVE RIGHTS AND DUTIES OF HNB AND THE COMMISSIONER

We summarize our analysis thus far. By virtue of its matured Assignment of Rents, HNB had a present legal right to collect the rental income from the subtenants of the Kaka'ako Properties. By virtue of his appointment as agent for the court in equity, the Commissioner, on the other hand, bore the duty to preserve the property. In addition, with respect to actual control of the subtenant rents, HNB had, at most, constructive possession of the Kaka'ako Proper-

**8.** *See also* 4 *Powell on Real Property* § 37.26[3][b] at 175 ("the receiver is acting on behalf of the court to preserve the property and the rights of the parties involved in the foreclosure action"); *Federal Home Loan Mortg. Corp. v. Spark Tarrytown, Inc.*, 829 F.Supp. 82, 85 (S.D.N.Y.1993) ("A receiver acts as an officer of the court and has the duty to preserve and protect the property pending the outcome of the litigation.") (internal quotation marks and citations omitted); *Keith County Bank & Trust Co. v. Wheat Belt Public*

*Power District*, 226 Neb. 850, 415 N.W.2d 459, 461 (1987) ("A receiver appointed in a mortgage foreclosure action serves for the purpose of conserving the mortgaged property[.]") (citation omitted); *United States Fidelity and Guaranty Co. v. Old Orchard Plaza Ltd. Partnership*, 284 Ill. App.3d 765, 220 Ill.Dec. 59, 672 N.E.2d 876, 882 (1996) ("A receiver ... is an officer of the court appointed to secure and preserve property for the benefit of all concerned.") (internal quotation marks and citations omitted).

ties, while the Commissioner had actual possession.

The respective rights and duties of HNB and the Commissioner clashed because under the exceptional circumstances of this case, HNB wanted to collect the rental income to pay its mortgage arrears, while the Commissioner was obligated to use the rental income to preserve the property by paying the ground rent to Bishop Estate.

Bearing in mind the equitable nature of foreclosure actions, we resolve this conflict by concluding that HNB's legal right to collect the rents was subordinate to the Commissioner's equitable duty to preserve the property.

We reach this conclusion because: (1) a commissioner in actual possession of the mortgaged property is entitled to collect the rental income and use it to fulfill his duty to preserve the property; (2) a mortgagee in constructive possession also bears a duty to preserve the property; and (3) although in this particular case HNB was content to allow the ground leases and thus its interest in the mortgaged property to terminate, in a leasehold mortgage foreclosure case it is generally beneficial to all concerned—including the mortgagee—and therefore equitable, that the ground rent be paid and the ground leases thus preserved.

First, we have described the well-accepted precept of common law that "rents are incident to possession." The Commissioner was therefore entitled to the rental income · by virtue of his actual possession of the Kaka'ako Properties,. *See Prudential Ins. Co. of America v. Corp. Circle Ltd.,* 103 Ohio App.3d 93, 100, 658 N.E.2d 1066 1070 (1995) (stating that the "receiver, by virtue of his possession, is entitled to the rents and profits that may issue from such possession[ ]"). Moreover, the Commissioner in this case was appointed and instructed by the court to "receive and collect all rents[.]"

The Commissioner was bound by the duty to preserve the mortgaged property. As we have discussed, this duty encompassed the obligation to pay the ground rent to Bishop Estate in order to preserve the ground leases. The Commissioner was empowered to use the rental proceeds, collected while in actual possession of the premises, in order to fulfill his responsibility to pay the ground rent to Bishop Estate. To conclude otherwise would leave the Commissioner with the responsibility to preserve the property, but without the means to fulfill that responsibility.

The duty we here impose upon a commissioner, though in this case adverse to the mortgagee's interests, is undergirded by a more basic rationale for the appointment of a commissioner which is favorable to the mortgagee's interests. A commissioner relieves the mortgagee of the burdens of responsibility and liabilities of possession attendant to the property foreclosed upon.

A mortgagee in exclusive possession of the property subjects itself to a plethora of responsibilities and liabilities. For example, a mortgagee in possession must exercise reasonable care in preserving and protecting the property, must make necessary repairs, may incur tort and contractual liabilities and must pay the necessary property taxes and other exactions. *Thompson on Real Property* § 101.02(a)(2) at 353–354.

Clearly, the mortgagee benefits from the appointment of a commissioner. *See generally Real Estate Finance Law* § 4.33 at 236. Hence, the commissioner assumes the duties and liabilities of possession at least in part for the sake of the mortgagee, including the duty to preserve the property.

Second, the duty to preserve the mortgaged property is not solely the commissioner's responsibility. It runs with possession. "A mortgagee who takes possession of property or who seize[s] the rents take[s] on a number of duties." *In re Hall Colttree Assoc.,* 146 B.R. at 677.[9]

---

9. *See also In re Rancourt,* 123 B.R. 143, 148 (Bankr.D.N.H.1991) ("if the mortgagee seeks to collect the rents, the mortgagee must likewise undertake the responsibilities and liabilities of management and operation of the business prem-

ises"); *Comerica Bank–Illinois v. Harris Bank Hinsdale,* 284 Ill.App.3d 1030, 220 Ill.Dec. 468, 673 N.E.2d 380, 382 (1996) ("To obtain the benefits of possession in the form of rents, the mortgagee must also accept the burdens associated

Accordingly, if it is correct that HNB had taken constructive possession of the Kakaʻako Properties upon the appointment of the Commissioner, HNB had to accept the duties of possession as well. These duties included preservation of the mortgaged property by paying ground rent to Bishop Estate. To hold otherwise would bestow upon HNB all the benefits of possession without its corresponding duties, and that would not be equitable.

Finally, although this case presents a rather unusual situation in which HNB was content to allow its interest in the mortgaged property to terminate along with the cancellation of the ground leases, it is generally in the mortgagee's interest to pay the ground rent.

> A mortgage on a lease . . . is like a mortgage on a toy balloon. Prick it and it's gone. And so with a leasehold mortgage if the lease is terminated in accord with its terms before its specified expiration.

1 Milton R. Friedman, *Friedman on Leases,* 4th ed., § 7.801 (1997); *see also Bowen v. Selby,* 106 Neb. 166, 183 N.W. 93 (1921). In other words, it usually behooves the mortgagee to ensure that the ground rent is paid. Otherwise, if the lease is allowed to terminate the mortgagee has a mortgage on nothing, which is nothing. "Once the lease has terminated, there is nothing to which the mortgage may attach as a lien[.]" 4 *Powell on Real Property* § 37.13[1] at 70.

In this case, HNB allowed the ground leases and its recumbent mortgage interest in the Kakaʻako Properties to terminate because the remaining terms of the ground leases were each less than one year.

Were the ground leases endowed, however, with an additional twenty years remaining it would be central to the interests of HNB to preserve them, because they would represent a substantial value to be auctioned to satisfy its mortgage arrears. We surmise that if this were the case, HNB would not oppose but insist that the ground rent be paid.

with possession—responsibilities and potential liability that follow whenever a mortgage goes into

Hence, in general it is also for the mortgagee's benefit that the commissioner pay the ground rent to preserve the mortgaged property. We see no good or equitable reason why the exception in this case should lead us to a different conclusion.

In the endgame of a lease, the stakes are always higher for the lender holding the lease as security. But HNB knew that from the beginning. And it saw its way clear to lend originally on the strength of ten-year residual lease terms.

The approach taken by our foreclosure courts parallels that of other courts dealing in dire straits:

> In a reorganization under Chapter 11, a bankruptcy court's objective is to preserve, if possible, an ongoing business. The perennial problem facing bankruptcy judges is to strike a proper balance between rights of the creditor and debtor. To do this, the judges make wide use of equitable and discretionary powers as provided by the Bankruptcy Code and Rules. Judges recognize that in many cases, especially single-asset cases involving commercial real estate, the use of cash collateral by the debtor is essential to a successful reorganization. They recognize that the only source of potential cash collateral is the rent generated by the leases. Understandably, they will endeavor to craft a recovery that will permit some use of the rents by the debtor.

*In re Jason Realty, L.P.,* 59 F.3d at 429.

We conclude, therefore, that although HNB had a present legal right to collect the subtenant rents, its right was subordinate to the equitable obligation of the Commissioner, attendant to his actual possession of the Kakaʻako Properties, to preserve the property interest by paying the ground rent to Bishop Estate. Our conclusion is buttressed by the correlative duty of HNB, in constructive possession, to likewise preserve the property without regard to its strategic position vis-a-vis the entropic ground leases.

default.").

We believe the trial court achieved a result that was fair, just and equitable under all of the circumstances of this particular case. And speaking of equity, we did not forget in forming our belief that HNB was not entirely forsaken in the matter of the subtenant rents, which it ultimately did enjoy to the tune of $114,518.82.

Accordingly, we hold that, under the facts of this particular case, the trial court was correct and *a fortiori* did not abuse its discretion in ordering the Commissioner to pay Bishop Estate's overdue ground rent first out of the subtenant rents he had collected from the Kaka'ako Properties, prior to any distribution to HNB.

## V. CONCLUSION

For all the foregoing reasons, we affirm: (1) the findings of fact, conclusions of law, and order denying HNB's motion for partial summary judgment and order granting judgment for Bishop Estate filed October 6, 1998; (2) the judgment filed October 6, 1998; and (3) the deficiency judgment in favor of HNB and against Cook filed January 5, 1999.

Dissenting Opinion of ACOBA, J.

### I.

### A.

The Trustees Under the Will and of the Estate of Bernice Pauahi Bishop, Deceased (Bishop Estate) are the fee simple owners and lessors of two lots of commercial real property located in Kaka'ako, Hawai'i (the Kaka'ako Properties). Pohukaina Ventures (Pohukaina) was a lessee of the Kaka'ako Properties.[1]

Hawai'i National Bank (HNB) held the following relevant instruments which covered Pohukaina's leasehold interest in the Kaka'ako Properties: (1) a mortgage, recorded on September 28, 1988, from Pohukaina to HNB and the promissory note it secured, which was co-signed by Pohukaina, Brian Richard Cook aka Brian R. Cook dba Windward Self Storage (Cook), and Kona Country Fair Venture (Kona Country), in the amount of $1,100,000 (Mortgage A); (2) a mortgage, recorded on July 12, 1989, from Pohukaina to HNB and the promissory note it secured, which was co-signed by Pohukaina, Cook, and Kona Country in the amount of $250,000 (Mortgage B); and (3) a mortgage, recorded on April 28, 1978, from Pohukaina to State Savings and Loan Association (State Savings), the promissory note it secured, signed by Pohukaina, in the amount of $600,000 (Mortgage C), and a "Collateral Assignment of Lease or Leases" (collateral assignment), all of which were ultimately assigned to HNB.[2]

### B.

Mortgages A and B contained the following language relating to the collection and payment of rent:

Mortgagor does hereby mortgage, assign and transfer unto Mortgagee, its successor and assigns, all of its leasehold interest [in the Kaka'ako Properties].

TO HAVE AND TO HOLD said Indenture of Lease and all the rights, interests and estate of Mortgagor, ... *and all the rents, issues and profits thereof* [.]

. . . .

*BUT UPON ANY DEFAULT* ... Mortgagor under any provision of this mortgage, or intended to be secured thereby, on any and every account, shall at the option of the Mortgagee become at once due and payable without notice or demand, and *with or without foreclosure the Mortgagee shall have the immediate right to receive and collect all rents and profits*

---

1. There were two separate leases for the two lots of commercial property located in Kaka'ako, Hawai'i to Pohukaina Venture (Pohukaina) by the Trustees of the Estate of Bernice Pauahi Bishop. The first lease was Lease No. 11,249 and the second lease was Lease No. 11,251.

2. On September 30, 1996, State Savings assigned the promissory note, a mortgage, and a "Collateral Assignment of Lease or Leases" to BTD–1996 NPC 1, L.L.C. (BTD). BTD then assigned its interests to Atlantic National Trust, L.L.C. (Atlantic), which in turn assigned its interest to HNB in an instrument recorded on January 27, 1998.

*due, and said rents and profits are hereby assigned to Mortgagee[.]*

(Emphases added).

Mortgages A and B were consented to by the lessor, Bishop Estate, through consent and estoppel certificates executed on September 12, 1988 and July 11, 1989.

Mortgage C, securing the April 25, 1978 promissory note signed by Pohukaina to State Savings, is similar to Mortgages A and B. It provides that State Savings was "TO HAVE AND TO HOLD the same, and all the right, interest, and estate of the Mortgagor in ... all the rents, issues, and profits" held under the leases of the Kaka'ako Property. Mortgage C also stated that in the event of a default, the Mortgagee "may receive and collect all rents, income, and profits from the property hereby mortgaged ... and said rents, income, and profits are hereby assigned to the Mortgagee."

Bishop Estate also consented to Mortgage C in a "Consent to Mortgage" document executed on April 11, 1978.

In the collateral assignment related to Mortgage C, (collateral assignment), Pohukaina assigned to State Savings the subleases on the Kaka'ako Properties and "all rents, income and profits" issuing from the Kaka'ako Properties. The collateral assignment provided in relevant part that

*[u]pon or upon any time after default in* the payment ... *the assignee* without in any way waiving such default *may at its option* ... sue for or otherwise *collect and receive all rents, income and profits of said premises, including those past due and unpaid* [.]

(Emphases added).

Thus, under all the mortgages, Bishop Estate agreed to look solely to its lessee's own credit for satisfaction of the semi-annual rent owed it. And in the event of the lessee's default, Bishop Estate relinquished additional security which might have been obtained from the subtenants' rents, in favor of the mortgagee, ultimately, HNB.

Conceivably, Bishop Estate agreed to the assignments of rents in order to accommodate Pohukaina's use of the property and, thereby, preserve the viability of Pohukaina's leasehold interest. However, once Bishop Estate consented to these assignments, I believe it had no legal or equitable right to priority in payment of the collected rent from the subtenants on the Kaka'ako Properties over that of HNB, the mortgagee. Following its lessee's default, Bishop Estate obtained what it was legally entitled to under its lease provisions, that is, a judgment for money damages against Pohukaina and cancellation of the ground leases.

### C.

The majority justifies its decision on the ground that the exercise of "equitable jurisdiction" is warranted to "conserve the equities of the parties" or when the strict adherence to the terms of an agreement would be "harsh and unreasonable under the circumstances." Majority opinion at 838–839 (citing *Honolulu, Ltd. v. Blackwell*, 7 Haw.App. 210, 219, 750 P.2d 942, 948 (1988); *Jenkins v. Wise*, 58 Haw. 592, 597–98, 574 P.2d 1337, 1341 (1978)). It reasons that since the Commissioner took possession of mortgaged property and had a duty to preserve the property for the benefit of all concerned, he had an equitable duty to pay the ground rent to Bishop Estate. Majority opinion at 839–840 and 841.

I must respectfully disagree.

As between Bishop Estate and HNB, there was no valid reason to, in effect, void the mortgage provisions and assignment. We are not concerned with a forfeiture provision which, historically, equity would refuse to enforce. Nor are we faced with "equities" which would make enforcement of the mortgage and assignment provisions "harsh and unreasonable." *Jenkins*, 58 Haw. at 597, 574 P.2d at 1341.

There is no evidence in the record to demonstrate that the payment of rent to Bishop Estate would extend the leases of the Kaka'ako Properties. The ground leases were cancelled as of January 26, 1998 pursuant to the trial court's grant of summary judgment to Bishop Estate. However, the leases were to terminate in any event on March 31, 1998 and April 30, 1998 respectively by their own terms, all within two and

three months of the cancellation. Thus, the April 1, 1998 report filed by the Commissioner said that "in absence of an extension of the ground lease by Bishop Estate, there was very limited probability in selling the Kaka[']ako Property." The Commissioner thus opined that "the Kaka[']ako Property was not marketable, and the time and considerable cost of auctioning the Kaka[']ako Property would not benefit any of the parties in this case." Therefore, as the leases had no market value they were not viable assets required to be equitably preserved for the mortgage creditors by the payment over to Bishop Estate of the subtenants' rents.

## II.

For the foregoing reasons, I would vacate the court's October 6, 1998 judgment incorporating the October 6, 1998 entitled "Findings of Facts; Conclusions of Law; Order Denying [HNB's] Motion for Partial Summary Judgment Filed on February 2, 1998 and Order Granting Judgment for [Bishop Estate]" and instruct the court to direct that rent collected from the Kaka'ako Properties be paid to the mortgagee, HNB, pursuant to the mortgages and collateral assignment.