58 P.3d 60

**HAWAI'I NATIONAL BANK,**
Petitioner–Appellant,

v.

Brian R. COOK, also known as Brian Richard Cook, dba Windward Self Storage, Pohukaina Venture; Kona Country Fair Venture, Respondents–Appellees,

First Hawaiian Bank; Bank of Honolulu; Finance Factors, Limited; City and County of Honolulu; United States of America; Federal Savings and Loan Insurance Corporation, Receiver for State Savings and Loan Association; John Does 1–50; Jane Does 1–50; Doe Partnerships 1–50; Doe Corporations 1–50; Doe Entities 1–50; and Doe Governmental Units 1–50, Respondents,

and

Trustees Under the Will and of the Estate of Bernice Pauahi Bishop, Deceased, Respondent–Appellee,

and

Atlantic National Trust Limited Liability Company, also known as Atlantic National Trust, L.L.C., Respondents. (Civ. No. 96–4088).

Trustees Under the Will of the Estate of Bernice Pauahi Bishop, Deceased, Respondent–Appellee,

v.

Hawai'i National Bank, Petitioner–Appellant.

and

Pohukaina Venture, and Brian R. Cook, also known as Brian Richard Cook, Respondents–Appellees,

and

Atlantic National Trust, LLC, Ahuimanu Land Corp., United States of America, City and County of Honolulu, John Does 1–50, Jane Does 1–150, Doe Partnerships 1–50, Doe Corporations 1–50, Doe Entities 3–50 And Doe Governmental Units 1–50, Respondents, (Civ. No. 97–4011).

No. 22225.

Supreme Court of Hawai'i.

Oct. 14, 2002.

As Corrected Nov. 21, 2002.

Robert M. Ehrhorn, Jr., and Elizabeth A. Kane, Honolulu, of Takushi Funaki Wong & Stone for petitioner-appellant Hawai'i National Bank on the application for writ of certiorari.

Cheryl A. Nakamura and Earl T. Sato, Honolulu, of Rush Moore, Craven Sutton Morry & Beh for respondents-appellees on the response.

MOON, C.J., LEVINSON, NAKAYAMA, and RAMIL, JJ., and Circuit Judge NAKAMURA, in place of ACOBA, J., recused.

Opinion of the Court by NAKAYAMA, J.

Petitioner-appellant Hawai'i National Bank [hereinafter "HNB"] applies to this court for a writ of certiorari to review the opinion of the Intermediate Court of Appeals (ICA) in *Hawai'i Nat'l Bank v. Cook*, 99 Hawaii 334, 55 P.3d 827, (Haw.Ct.App. 2000) [hereinafter, the "ICA's opinion" or "the majority"]. The majority affirmed the circuit court's: 1) findings of fact, conclusions of law, and order denying HNB's motion for partial summary judgment and order granting judgment in favor of respondent-appellee Trustees Under the Will and of the Estate of Bernice Pauahi Bishop, Deceased [hereinafter "Bishop Estate"], filed on October 6, 1998; 2) judgment entered pursuant thereto, filed on the same date; and 3) deficiency judgment in favor of HNB and against respondent-appellee Brian R. Cook, also known as Brian Richard Cook, dba Windward Self Storage [hereinafter

"Cook"], filed on January 5, 1999. The majority held that the foreclosure commissioner had an equitable duty to preserve the property by using the subtenant rents to pay the outstanding ground lease rent to Bishop Estate before paying the amounts owed to HNB and that this duty was paramount over HNB's legal right to the subtenant rents. In its application for a writ of certiorari, HNB argues that the majority's holding was erroneous because Bishop Estate consented to HNB's mortgages, which contained assignment of rents provisions.

We hold that HNB had an enforceable right to the subtenant rents until Bishop Estate took the necessary action to perfect its interest in the subtenant rents. Further, insofar as the leases prior to cancellation were not marketable due to the limited time remaining on each term, the equitable duty to preserve the property does not override HNB's legal right to the subtenant rents. Therefore, we hold that the circuit court abused its discretion in ordering that all of the subtenant rents, minus expenses, be used to pay the amounts owed to Bishop Estate before paying the amounts owed to HNB. We reverse the ICA's opinion and remand this case to the circuit court for further proceedings consistent with this opinion.

## I. BACKGROUND

### A. Factual background

As noted by the ICA, the facts of this case are not in dispute. Bishop Estate was the lessor and Pohukaina Venture, by assignment, was the lessee of two lots of commercial real property located in Kaka'ako, Hawai'i (the Kaka'ako Properties). Lease No. 11,249 (Lease 1) commenced on April 1, 1958 and was to terminate on March 31, 1998. Lease No. 11,251 (Lease 2) commenced on May 1, 1958 and was to terminate on April 30, 1998.

HNB held the following instruments covering various properties, including Pohukaina's leasehold interest in the Kaka'ako Properties: 1) a September 29, 1988 promissory note in the amount of $1,100,000, co-signed by Pohukaina, Cook, and Kona Country Fair Venture; 2) a mortgage from Pohukaina to HNB securing Note A (Mortgage A), recorded on September 28, 1988; 3) a July 12, 1989 promissory note (Note B) in the amount of $250,000, co-signed by Pohukaina, Cook, and Kona Country Fair Venture; and 4) a mortgage from Pohukaina to HNB securing Note B (Mortgage B), recorded on July 12, 1989. Bishop Estate consented to each of the mortgages. On December 18, 1997, during the pendency of this case, HNB also acquired a promissory note, first mortgage, and collateral assignment of the leases (Collateral Assignment) from Atlantic National Trust Limited Liability Company (Atlantic). Bishop Estate also consented to Atlantic's mortgage.

All of the mortgages contained assignment of rents provisions. Mortgages A and B provided, in pertinent part, that:

Mortgagor does hereby mortgage, assign and transfer unto Mortgagee, its successors and assigns, all of its leasehold interest described in Exhibit "A" [describing the Kaka'ako Properties] attached hereto and made a part hereof.

TO HAVE AND TO HOLD said Indenture of Lease and all the rights, interest and estate of the Mortgagor, both at law and in equity, in and to the premises hereby demised and all buildings and improvements now or hereafter situate or being on said premises, and all and singular the tenements, hereditaments, rights, privileges and appurtenances thereunto belonging, *and all of the rents, issues and profits thereof,* unto the Mortgagee and the successors and assigns of the Mortgagee for and during the remainder of the term of said lease yet to come and unexpired.

. . . .

And [the mortgagor] will punctually pay the rent at the times and in the manner in said lease required[.]

. . . .

BUT UPON ANY DEFAULT in the performance or observance of any covenant or condition herein or in any promissory note contained or of the terms of any other indebtedness hereby secured, . . . then, in each such event, the whole amount of all indebtedness owing by or chargeable to the Mortgagor under any provision of this mortgage, or intended to be secured

hereby, on any and every account, shall at the option of the Mortgagee become at once due and payable without notice or demand, and *with or without foreclosure the Mortgagee shall have the immediate right to receive and collect all rents and profits due or accrued or to become due, and said rents and profits are hereby assigned to the Mortgagee* . . . .

(Emphases added.) The Collateral Assignment also assigned "all rents, income and profits" arising from the Kakaʻako Properties to HNB. It provided that:

So long as there shall exist no default by the assignor . . . the assignor shall have the right to collect . . . all rents, income and profits arising under said lease or from the premises described therein and to retain, use and enjoy the same.

. . . .

*[U]pon or at any time after default* in the payment . . . *the assignee* without in any way waiving such default *may at its option* without such notice and without regard to the adequacy of the security for the said principal sum, interest and indebtedness secured hereby and by said note and mortgage, either in person or by agent, with or without bringing any action or proceeding, or by a receiver appointed by a court, take possession of the premises described in said lease and/or mortgage and have, hold, manage, lease and operate the same on such terms and for such period of time as the assignee may deem proper and *either with or without taking possession* of said premises in its own name, demand, sue for or otherwise *collect and receive all rents, income and profits of said premises*, including those past due and unpaid. . . .

(Emphases added.) Neither Lease 1 nor Lease 2 expressly granted Bishop Estate an interest in the subtenant rents.

## B. Procedural Background

On October 4, 1996, HNB filed a complaint for foreclosure on, among others, the Kakaʻako Properties (Civil Number 96–4088). Cook, Pohukaina, and Kona Country were among the defendants named, but Bishop Estate was not named. The complaint alleged that, as of October 15, 1996, a total of $912,124.92 was outstanding on Note A based on the following:

| | |
|---|---|
| Principal | $889,586.21 |
| Interest from 7/30/96 to 10/15/96 at 10.75% per annum | 20,258.71 |
| Late charges | 2,280.00 |

HNB also claimed a per diem interest accrual of $261.29 per day for each day from October 15, 1996 until the outstanding amounts on Note A were paid. The complaint also alleged that, as of October 15, 1996, a total of $191,665.52 was outstanding on Note B based on the following:

| | |
|---|---|
| Principal | $187,191.96 |
| Interest from 7/30/96 to 10/15/96 at 10.75% per annum | 4,233.56 |
| Late charges | 240.00 |

HNB also claimed a per diem interest accrual of $54.98 per day for each day from October 15, 1996 until the outstanding amounts on Note B were paid.

On November 22, 1996, HNB filed a motion for summary judgment and for an interlocutory decree of foreclosure. The circuit court entered an order granting the motion and a judgment pursuant thereto on February 14, 1997. The circuit court appointed Glenn Okada (the Commissioner) as the commissioner for the Kakaʻako Properties. The Commissioner subsequently began to collect the rents from the subtenants on the Kakaʻako Properties. On June 17, 1997, the Commissioner filed a motion for instructions regrading the distribution of the rents collected.

On October 1, 1997, Bishop Estate filed a separate action to cancel the ground leases for nonpayment of the ground rents (Civil Number 97–4011). On October 3, 1997, Bishop Estate also filed a motion to intervene in HNB's foreclosure action. The two cases were consolidated on November 17, 1997.

In the interim, Bishop Estate also filed a motion for the appointment of a receiver. Bishop Estate asked that the receiver be appointed to, *inter alia*, "operate and manage the [Kakaʻako Properties], and to demand, collect, receive, and to hold, to the credit of this cause, all proceeds, profits, and receipts from the [Kakaʻako Properties.]" Bishop Estate noted that the person appointed as the receiver could be the same person serving as commissioner in HNB's

foreclosure action. HNB filed a memorandum in opposition to Bishop Estate's motion. HNB argued that: the leases did not provide Bishop Estate with the remedies of the appointment of a receiver and the collection of subtenant rents; the requirements for the appointment of a receiver stated in *Oyama v. Stuart*, 22 Haw. 693 (1915), were not met; and the only remedy available to Bishop Estate was to petition the court for the establishment of a rent trust fund pursuant to HRS § 521–78 (1993).[1] On November 3, 1997, the circuit court entered an order denying Bishop Estate's motion. The order did not explain the court's reasons for denying the motion.[2]

Bishop Estate filed a motion for partial summary judgment on November 26, 1997, seeking cancellation of the leases on the Kaka'ako Properties. The circuit court entered an order granting the motion on January 26, 1998. The court cancelled the leases as of January 26, 1998 and granted a money judgment against Pohukaina and its general partners, Cook and Ahuimanu Land Corp., for the unpaid ground rents. No foreclosure sale had been scheduled prior to the cancellation of the leases.

On February 2, 1998, HNB filed a motion for partial summary judgment, seeking an order directing the Commissioner to tender the subtenant rents to it based on the assignment of rents provisions. Bishop Estate opposed the motion and argued that the outstanding ground rent should be paid from the subtenant rents before HNB was paid.

The Commissioner filed a report on April 1, 1998. From March 1997 until the cancellation of the leases in January 1998, he collected $443,830.85 from the Kaka'ako Properties. The Commissioner reported a net income of $363,303.59 available for distribution among the parties.

The Commissioner's report also concluded that the Kaka'ako Properties leases were not marketable and stated that conducting an auction of the leases would not have benefitted any of the parties. The Commissioner reported that those that had expressed possible interest in the Kaka'ako Properties were concerned with the short period of time remaining before the lease terms expired. The Commissioner met with Bishop Estate to discuss the possibility of extending the leases or negotiating new leases with potential buyers. However, Bishop Estate indicated that it intended to take back the Kaka'ako Properties at the end of the lease terms.

The circuit court held a hearing on HNB's motion for partial summary judgment on April 6, 1998. On October 6, 1998, the court entered its findings of fact, conclusions of law, and order denying the motion and granting judgment in favor of Bishop Estate. The court found that, as of the cancellation of the leases, the following ground rents were owed to Bishop Estate:

| | |
|---|---|
| Lease 1 | $106,192.07 |
| Lease 2 | 114,520.00 |
| Total | $220,712.07 |

The court ordered the $363,303.59 net income from the Kaka'ako Properties to be paid as follows: 1) $18,031.00 to the Commissioner for fees and costs; 2) $10,041.70 to the attorney for the Commissioner for attorney's fees; 3) $220,712.07 to Bishop Estate for the outstanding ground rents; and 4) the remaining $114,518.82 to HNB toward the amounts outstanding on the Notes. A judgment pursuant to the findings of fact, conclusions of law, and order was also entered on October 6, 1998. The circuit court entered a deficiency judgment in favor of HNB and against Cook, Pohukaina, and Kona Country on January 5, 1999. HNB timely appealed.[3]

---

1. Atlantic also filed a memorandum in response to Bishop Estate's motion, arguing that its claim to the subtenant rents under the assignment of rents provision was superior to any claim that Bishop Estate may have to the subtenant rents and, therefore, Bishop Estate was not entitled to the appointment of a receiver.

2. The transcripts of the October 23, 1997 hearing on the motion are not part of the record on appeal.

3. On October 26, 1998, HNB filed an appeal from the October 6, 1998 judgment. This court dismissed the appeal on January 14, 1999 because the record on appeal did not include the deficiency judgment. *See Hoge v. Kane I*, 4 Haw. App. 246, 247, 663 P.2d 645, 647 (1983) (stating that in foreclosure actions, the last and final order triggering the time to file the appeal is the deficiency judgment). HNB subsequently filed a timely notice of appeal from the deficiency judgment.

## C. The ICA's opinion

On appeal, HNB argued that the circuit court erred in ordering that the subtenant rents be used to pay the outstanding ground rents to Bishop Estate before being applied to the amounts owed to HNB because: 1) HNB had a valid, perfected security interest in the subtenant rents pursuant to the assignment of rents provisions in the mortgages, to which Bishop Estate consented; and 2) Bishop Estate exercised its only legal remedy, which was to cancel the leases. Bishop Estate argued that the circuit court should be affirmed because: 1) either the Commissioner or HNB had an obligation to pay the ground rents based on the possession of the Kaka'ako Properties; 2) the right to payment of the ground rent was not in the nature of a lien and Bishop Estate had not surrendered its rights to the subtenant rents; and 3) equity weighed in favor of Bishop Estate because HNB did not name Bishop Estate as a party in the foreclosure action and chose not to conduct an auction of the leases. The ICA affirmed the circuit court's judgment and orders.

The ICA held that "although HNB had a present legal right to collect the subtenant rents, its right was subordinate to the equitable obligation of the Commissioner, attendant to his actual possession of the Kaka'ako Properties, to preserve the property interest by paying the ground rent to Bishop Estate." 99 Hawai'i at 349, 55 P.3d at 842. The ICA emphasized that this duty to preserve the property existed even under the circumstances of the present case, where less than a year remained on each lease upon foreclosure.

Associate Judge Acoba dissented. In his view, because Bishop Estate consented to the assignment of rents, it had no legal or equitable right to priority in the subtenant rents. Judge Acoba further disagreed with the majority's analysis of the Commissioner's duty to preserve the leases because "as the leases had no market value they were not viable assets required to be equitably preserved for the mortgage creditors by the payment over to Bishop Estate of the subtenants' rents." Dissent at 99 Hawai'i at 352, 55 P.3d at 845.

HNB filed a timely application for a writ of certiorari on June 15, 2000 and Bishop Estate filed a response on June 22, 2000.

## II. DISCUSSION

### A. Standard of review

■ We review the trial court's [conclusions of law] de novo under the right/wrong standard. *Raines v. State*, 79 Hawai'i 219, 222, 900 P.2d 1286, 1289 (1995). "Under this . . . standard, we examine the facts and answer the question without being required to give any weight to the trial court's answer to it." *State v. Miller*, 4 Haw.App. 603, 606, 671 P.2d 1037, 1040 (1983). *See also Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 119, 839 P.2d 10, 28, *reconsideration denied*, 74 Haw. 650, 843 P.2d 144 (1992). Thus, a [conclusion of law] "is not binding upon the appellate court and is freely reviewable for its correctness." *State v. Bowe*, 77 Hawai'i 51, 53, 881 P.2d 538, 540 (1994) (citation omitted).

*Chun v. Board of Trustees of Employees' Retirement Sys. of State of Hawai'i*, 92 Hawai'i 432, 438–39, 992 P.2d 127, 133–34 (2000) (quoting *Brown v. Thompson*, 91 Hawai'i 1, 8–9, 979 P.2d 586, 593–94 (1999)) (some citations omitted) (alterations in original).

■ However, foreclosure is an equitable action. *Honolulu, Ltd. v. Blackwell*, 7 Haw. App. 210, 219, 750 P.2d 942, 948 (1988) (citing *Honolulu Plantation Co. v. Tsunoda*, 27 Haw. 835 (1924)).

The relief granted by a court [in] equity is discretionary and will not be overturned on review unless the [circuit] court abused its discretion by issuing a decision that clearly exceeds the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of the appellant.

*Shanghai Inv. Co. v. Alteka Co.*, 92 Hawai'i 482, 493, 993 P.2d 516, 526 (2000) (quoting *Aickin v. Ocean View Invs. Co.*, 84 Hawai'i 447, 453, 935 P.2d 992, 998 (1997)).

## B. HNB was legally entitled to the subtenant rents until Bishop Estate activated its implied assignment.

The majority acknowledged that HNB had an enforceable, legal right to the subtenant rents pursuant to the assignment of rents provisions. 99 Hawai'i at 345, 55 P.3d at 838. However, the majority held that, because HNB did not have possession of the property and because foreclosure is an equitable action, Bishop Estate's right to payment of the ground rent based on the Commissioner's equitable duty to preserve the property was superior to HNB's legal right. In its application for a writ of certiorari, HNB argues that its legal right under the assignment of rents provisions was superior to any claim that Bishop Estate had to the subtenant rents because Bishop Estate consented to the mortgages.

In its response to HNB's application, Bishop Estate argues that it had legal priority to the subtenant rents based on the terms of its consent to HNB's mortgages. The consent instruments executed by Bishop Estate provide that "should there be any conflict between the terms of said leases and the terms of said Mortgage, the former shall control, and that nothing herein shall be construed as being a waiver of any of the terms, covenants and conditions of said leases." Although Bishop Estate acknowledges that the leases did not purport to assign any rights to subtenant rents, in its view, the covenant to pay the ground rent was in conflict with HNB's assignment of rents and, therefore, the covenant to pay rent should control.

It has been recognized that "if the prime tenant is insolvent the head landlord may resort to the subrents and has a preference therein ahead of other creditors of the prime tenant-to the extent necessary to satisfy the prime tenant's liability under the head lease." 1 Milton R. Friedman, Friedman on Leases § 7.701 at 410 (4th ed.1997) (citing *Central Manhattan Properties, Inc. v. D.A. Schulte, Inc.*, 91 F.2d 728 (2d Cir.1937); *Young v. Wyatt*, 130 Ark. 371, 197 S.W. 575 (1917); *City Inv. Co. v. Pringle*, 69 Cal.App. 416, 231 P. 355 (1924), *later decision*, 239 P. 302 (Cal. App.1925); *S.S. Kresge Co. v. Twelve Seventy-Five Woodward Ave. Corp.*, 270 Mich. 218, 258 N.W. 252 (1935); *Shaw v. Creedon*, 133 N.J. Eq. 397, 32 A.2d 721 (1943); 49 Am. Jur.2d *Landlord and Tenant* § 1184 (1995 rev.) (some citations omitted)).[4] Friedman also states:

> A lease that contemplates subletting by the prime tenant generally includes a collateral assignment of subrents to the prime landlord, the assignment to become effective on default under the prime lease or its termination for breach. This assignment has been assimilated to the rent pledge included in mortgages in those states that follow the lien theory of mortgages. Following this mortgage rule, it is held that *mere nonpayment of rent by the prime tenant is insufficient to activate the assignment.*

*Id.* at 412, 32 A.2d 721 (citing *Childs Real Estate Co. v. Shelburne Realty Co.*, 23 Cal.2d 263, 143 P.2d 697 (1943); *Lincoln Crest Realty, Inc. v. Standard Apartment Dev. Co.*, 61 Wis.2d 4, 211 N.W.2d 501 (1973)) (emphasis added).

In *Childs*, the Bank of America National Trust and Savings Association (Bank) was the successor trustee to a trust indenture executed by lessee Shelburne Realty Company (Shelburne).[5] After Shelburne defaulted on the loan, Bank appointed Shelburne its agent to collect the subtenant rents and manage the building. Shelburne and Bank agreed that these monies belonged to Bank.

---

**4.** In *S.S. Kresge*, the Supreme Court of Michigan noted that the rule that a landlord has an equitable lien on subtenant rents originated in English common law. 258 N.W. at 253 (citing *Treackle v. Coke*, 23 Eng. Rep. 389 (1683)). The court stated that the basis of the rule was that

> rent is something which a tenant renders out of the profits of the land which he enjoys. Equitably, it is a charge upon the estate, and the lessee, in good conscience, ought not to take the profits therefor without a due dis-

charge of the rent.... The creditors of an insolvent lessee can have no moral or equitable claim to the profits issuing from leased land, until after the landlord's claim for rent is satisfied.

*Id.* (quoting *Otis v. Conway*, 114 N.Y. 13, 20 N.E. 628 (N.Y.1889)) (alteration in original).

**5.** At the time the indenture was executed, Shelburne was known as the L. Harris Realty Company. 143 P.2d at 698.

Shelburne subsequently defaulted on its lease and the lessor, Childs Company of Providence (Childs), served a notice of default and, later, a notice of termination of the lease. 143 P.2d at 698–99. The lease provided, *inter alia*, that the rent shall be a "first lien and superior to an incumbrance created by lessee ... upon all rents[ .]" *Id.* at 699. The trust indenture was subject to terms and conditions of the lease. *Id.* The California Supreme Court stated that a lessor's claim to subtenant rents is akin to that of a mortgagee. The lessor has an equitable lien or security interest but, unless the lease provides otherwise, equitable action is necessary to make the lien operative. *Id.* (citations omitted). Thus, the court held that Childs' right to the subtenant rents did not accrue until Childs obtained possession of the property; Bank was entitled to keep the subtenant rents it had collected until Childs took possession. *Id.* at 700.

The Wisconsin Supreme Court reached a similar result in *Lincoln Crest*. Lincoln Crest Realty, Inc. (Lincoln) leased Lincoln Crest Apartments to Standard Apartment Development (Standard). Standard assigned its subtenant rents to Lincoln.[6] As security for a loan from Midland National Bank (Midland), Standard assigned its rights under the lease to Midland. However, the assignment expressly stated that the assignment of subtenant rents was subordinate to Lincoln's rights to those rents. According to Lincoln, it terminated Standard's lease on January 26, 1971. On February 2, 1971, Lincoln filed a complaint for a declaration that the lease had been terminated or a judgment terminating the lease and an order directing Standard to surrender the premises. The next day, Midland was served with the complaint and an order restraining it from expending any subtenant rents. At that time, Standard had $24,002.47 in its operating account at Midland. Midland offset this amount with the balance owed by Standard under its note as of September 28, 1970. 211 N.W.2d at 503–04. The court held that

the lessor could only gain the right to the rents and profits of the real estate by the appointment of a receiver for that purpose, by taking actual possession of the property, by a declaration of constructive possession by a court order, or by the court's declaration of the lease termination date.

*Id.* at 504–05. Although Lincoln had a contractual right to the subtenant rents, the right did not take effect until it gained actual or constructive possession of the property or secured the appointment of a receiver. *Id.* at 505. Therefore, the funds deposited in Standard's account prior to the lease termination date belonged to Standard and were subject to Midland's offset. Only rents and profits derived after the termination were subject to Lincoln's assignment. *Id.* at 506.

■ In the present case, Bishop Estate's lease did not have an assignment of rents provisions. However, Bishop Estate's interest in the subtenant rents is implied pursuant to the general principle that a lessor has a preference in the subtenant rents over the lessee's creditors. *See supra.* We agree with the court in *Childs* that, absent express language to the contrary in the lease, a lessor's interest in the subtenant rents is akin to that of a mortgagee's interest. Thus, when Bishop Estate became able to enforce its rights to the subtenant rents depends upon whether its implied assignment of rents is viewed as an absolute assignment or the assignment of a security interest.

■ As noted by the ICA, an absolute assignment of rental proceeds is "self-executing"; it gives the assignee immediate title to the rental proceeds but postpones their collection until a certain event occurs, such as the assignor's default. 99 Hawaiʻi at 343, 55 P.3d at 836. In contrast, an assignment of a security interest does not pass title to the rental proceeds and is not self-executing. The assignee has a lien on the rental proceeds that can be enforced once the assignee takes certain actions. The assignee obtains

6. The assignment provided that it would become operative and effective only in the event that this lease and the term thereof shall be terminated or cancelled pursuant to the terms and conditions hereof, or in the event of

the issuance and execution of a dispossess warrant or other re-entry or repossession by Landlord under the provisions hereof, or in the case of an event of default on the part of Tenant. 211 N.W.2d at 503 n. 1.

the right to collect the rents by obtaining possession of the premises, securing the appointment of a receiver, or by taking some other equivalent action, such as giving notice to the assignor or the subtenants that it is enforcing its right to the rents or by sequestering the rents. *Id.* at 343–344, 55 P.3d at 836, 837. States vary as to whether and when they recognize each type of assignment. *Id.* at 344–345, 55 P.3d at 837, 838.

This state has never addressed what is necessary to create either an absolute assignment or an assignment of a security interest. However, Hawai'i mortgage law is based on the lien theory, *FHLMC v. Transamerica Ins. Co.*, 89 Hawai'i 157, 164, 969 P.2d 1275, 1282 (1998), and absolute assignments are generally disfavored in lien theory jurisdictions. (*See* 12 Thompson on Real Property § 101.02(c)(3) at 365 (David A. Thomas ed., 1994) ("[t]he usual view in lien theory jurisdictions seems to be that the clauses, even if worded as absolute assignments, create a type of security interest which is not self-executing")). The Texas Supreme Court has stated:

> Courts have been reluctant to construe assignment of rentals clauses to operate as absolute assignments. The public policy embracing the rule was articulated by Justice Augustus Hand in *Prudential Insurance Company of America v. Liberdar Holding Corp.*, 74 F.2d 50 (2d Cir.1934):
>
> "It seems unlikely that mere words of assignment of future rents can entitle a mortgagee to claim rentals which have been collected by a mortgagor and mingled with its other property. Sound policy as well as every probable intention should prevent a mortgagee from interfering with the mortgagor's possession until the mortgagee takes steps to get the rentals within his control. To hold otherwise would be to impose unworkable restrictions upon industry in cases where mortgagors have been led to suppose that they might rightfully apply the rentals to their own business."

It has also been felt that to construe the clause as an absolute assignment of rents would impose no duty upon the mortgagee to collect rents, and gives the mortgagor no assurance that the mortgagee would collect them and apply them to the debt. Osborne, G., Mortgages (2d ed.1970) § 150 at 252.

*Taylor v. Brennan*, 621 S.W.2d 592, 594 (Tex. 1981). The United States Court of Appeals for the Fifth Circuit has also recognized that absolute assignments are inconsistent with the expectations of the assignor, who may hope to "have a chance to negotiate informally after experiencing financial difficulties." *FDIC v. International Property Management, Inc.*, 929 F.2d 1033, 1036 (5th Cir. 1991). Thus, the United States Court of Appeals for the Fifth Circuit noted that "[b]ecause an absolute assignment generally is not intended by the parties, Texas, for public policy reasons, requires especially clear evidence that the parties intended to create such an assignment." *Id.*

 We agree that public policy weighs against construing assignment of rents clauses as absolute assignment absent a clear indication that the parties intended to create one. Therefore, we hold that, where a lessor has an implied assignment of subtenant rents, it shall be construed as an assignment of a security interest. Because the lessor's right to the subtenant rents is not self-executing, some action is necessary before the right is perfected.[7] For example, the lessor may obtain either actual or constructive possession of the property or secure the appointment of a receiver. *See Lincoln Crest*, 211 N.W.2d at 504–05. Until the lessor takes action to activate the assignment, an intervening creditor with a perfected assignment of rents will be entitled to collect the rents, even though the rents were subject to the lessor's assignment at the time the creditor obtained its assignment. However, once the lessor perfects its assignment, the lessor has priority over the intervening creditor from

7. In the context of real estate law, "the term 'perfection' is frequently used to describe the moment at which the holder of a [security interest] assignment of rents has taken the steps required under state law to be entitled to direct payment of the rents...." Laurence D. Cherkis & Lawrence P. King, Collier Real Estate Transactions and the Bankruptcy Code ¶ 2.03[1][c][iv] at 2–106.3 (2000).

the date of perfection. Cherkis & King, *supra* note 7, at ¶ 2.03[1][c][iv] at 2–106.5 (citations omitted).

■ In the present case, because the leases did not have an assignment of rents clause, Bishop Estate had only an implied security interest assignment in the subtenant rents. HNB's mortgages had assignment of rents clauses and, as noted by the ICA, whether they were absolute assignments or assignments of a security interest, HNB had a present right to collect the subtenant rents. 99 Hawai'i at 344–345, 55 P.3d at 837, 838. Therefore, HNB had an enforceable right to the subtenant rents until Bishop Estate took the necessary action to perfect its interest. *Accord Childs, supra,* and *Lincoln Crest, supra.* Bishop Estate filed a motion for the appointment of a receiver and, had the motion been granted, Bishop Estate's interest would have been perfected. However, the circuit court denied the motion and the record on appeal does not indicate the basis for the court's decision.

In its memorandum in opposition to Bishop Estate's motion, HNB argued that Bishop Estate was not entitled to the appointment of a receiver because: Bishop Estate did not have a legal right to the subtenant rents; the requirements of *Oyama v. Stuart, supra,* were not met; and Bishop Estate's only remedy was to petition the circuit court for the establishment of a rent trust. Thus, until Bishop Estate perfected its interest in the subtenant rents, HNB was entitled to collect the rents and apply them to the amounts owed on the notes.

■ Contrary to HNB's argument, however, Bishop Estate was entitled to the appointment of a receiver to collect the subtenant rents and the circuit court erred in denying the motion. As previously discussed, Bishop Estate's only remedy was to petition the circuit court for the establishment of a rent trust, but it was not entitled to receive the monies until it perfected its interest. The appointment of a receiver would have perfected Bishop Estate's interest in the subtenant rents and given it priority over HNB's interest. The circuit court entered an order erroneously denying Bishop Estate's motion on November 3, 1997. *Oyama* states that:

> As a basis for the appointment of a receiver, the plaintiff must show, not only that he has an interest in or right to the fund or property, but that the possession of the property by the defendant was obtained by fraud; or that the property itself, or the income arising from it, is in danger of loss from the neglect, waste, misconduct or insolvency of the defendant.

22 Haw. at 698 (citation and internal quotation marks omitted). Finally, HNB argued that the appointment of a receiver was improper because Bishop Estate had a specific remedy available to it under HRS § 521–78 (1993).[8] However, HRS Chapter 521 is the *"Residential* Landlord–Tenant Code," *see* HRS § 521–1 (1993) (emphasis added), and, therefore, does not apply in the present case involving commercial properties.

Contrary to HNB's argument, the circuit court erred in denying Bishop Estate the appointment of a receiver. *Oyama* points out that one of the bases of appointing a receiver is an interest in the property and that "the income arising from it[ ] is in danger of loss from ... insolvency of the defendant[.]" *Id.* at 698. Because the prime lessee became insolvent, Bishop Estate was entitled to the appointment of a receiver to

---

8. HRS § 521–78 provides in pertinent part:
**Rent trust fund.** (a) At the request of either the tenant or the landlord in any court proceeding in which the payment or nonpayment of rent is in dispute, the court shall order the tenant to deposit any disputed rent as it becomes due into the court as provided under subsection (c)....

....

(c) The court in which the dispute is being heard shall accept and hold in trust any rent deposited under this section and shall make such payments out of money collected as provided herein. The court shall order payment of such money collected or portion thereof to the landlord if the court finds that the rent is due and has not been paid to the landlord and that the tenant did not have any basis to withhold, deduct, or otherwise set off the rent not paid. The court shall order payment of such money collected or portion thereof to the tenant if the court finds that the rent is not due or has been paid, or that the tenant had a basis to withhold, deduct, or otherwise set off the rent not paid.

**12**

collect the subtenant rents. The appointment of a receiver would have perfected Bishop Estate's interest in the subtenant rents and given it priority over HNB's interest. The circuit court entered an order erroneously denying Bishop Estate's motion on November 3, 1997. Therefore, we deem Bishop Estate's interest in the subtenant rents to have been perfected on that date. HNB was entitled to the subtenant rents accrued and collected prior to November 3, 1997 and Bishop Estate was entitled to the rents from November 3, 1997 until the termination of the leases.

C. **Insofar as the leases were not marketable, the equitable duty to preserve the property did not apply.**

■ The ICA based its holding that Bishop Estate was entitled to the subtenant rents on the Commissioner's equitable duty to preserve the property. *See* 99 Hawai'i at 347, 55 P.3d at 840 (citing 1 Real Estate Finance Law, § 4.33 at 235 (stating that a receiver takes "possession of the mortgaged property to repair or preserve the property and to collect rents"); *Anes v. Crown Partnership,* 113 Nev. 195, 932 P.2d 1067, 1069 (1997) ("Customarily, a receiver is a neutral party appointed by the court to take possession of property and preserve its value for the benefit the person or entity subsequently determined to be entitled to the property.")). The leases would have expired on March 31 and April 30, 1998. The Commissioner determined that, without an extension of the ground lease terms, the leases were not commercially marketable. The Commissioner met with Bishop Estate to discuss the possibility of extending the ground lease, but Bishop Estate refused. Although acknowledging the unusual circumstances of the present case, the ICA noted that it is generally in the leasehold mortgagee's interest to insure that the ground rent is paid. *Id.* at 349, 55 P.3d at 842. The majority noted that if the leases had twenty years remaining, HNB would favor the payment of the ground rent because it would allow for the sale of the leases. *Id.* at 349, 55 P.3d at 842.

However, the ICA's example presents a fundamentally different situation than that presented in the instant case. In balancing the equities between the parties in this foreclosure proceeding, the imminent expiration of the lease terms cannot be ignored. If there were twenty years remaining in Pohukaina's leases on the Kaka'ako Properties, the leases would have been commercially marketable assets and the duty to preserve the property would require that the ground rents be paid before the leases were sold. In the present case, with only a matter of months remaining on each of the ground leases, payment of the ground rents would not have made the leases marketable. As such, the duty to preserve the property did not apply.

We further note that Bishop Estate had already obtained cancellations of the leases and awarding it priority payment from the subtenant rents allowed it to obtain satisfaction of its judgment in full. This effectively gave Bishop Estate full payment under the ground leases as well as an early return of the property for nonpayment. In contrast, HNB, which was owed an excess of $1.1 million, received only $114,518.82 even though it had a valid assignment of rents, which Bishop Estate consented to, and it perfected its interest before Bishop Estate perfected its interest. This result can hardly be called fair, just, and equitable in light of the circumstances of this particular case. We believe that, under circumstances of this case, equity does not require this court to alter HNB's legal right to the subtenant rents that accrued and were collected prior to November 3, 1997, the date Bishop Estate is deemed to have perfected its interest in the subtenant rents.

### III. CONCLUSION

Based on the foregoing, we reverse the ICA's opinion. We remand this case to the circuit court to pro rate the $335,230.89 available for distribution [9] between HNB and

---

9. Of the $363,303.59 net income collected from the properties, the Commissioner received $18,031.00 for fees and costs, and the Commissioner's attorney received $10,041.70 for attorney's fees.

Bishop Estate. HNB is entitled to the pro rata portion representing the rents accrued and collected prior to November 3, 1997 and Bishop Estate is entitled to the pro rata portion representing the rents accrued and collected from November 3, 1997 until the termination of the leases on January 26, 1998.